IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| MARCUS MOTE, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | ACTION NO. 4:16-CV-00203-RC |
| | § | |
| | § | |
| DEBRA WALTHALL, | § | |
| | § | |
| Defendant. | § | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENTAND BRIEF IN SUPPORT**

---

David K. Watsky
State Bar Number 20932600
**LYON, GORSKY & GILBERT, LLP**
12001 N. Central Expressway
Suite 650
Dallas, Texas 75243
Phone: (214) 965-0090
Fax: (214) 965-0097
Email: dwatsky@lyongorsky.com

**ATTORNEYS FOR PLAINTIFF**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.........................................................................iv

INTRODUCTION ………............................................................................ 1

STATEMENT OF DISPUTED FACTS ................................................. 2

STATEMENT OF ISSUES ……...……....……………………………….. 17

EVIDENCE …………………………………………………………....…..18

ARGUMENT AND AUTHORITIES ...................................................18

A. The Parties' Burdens on Summary Judgment ………………………....… 18

B. General Principles Governing the Court's Review
Of the Evidence ………….……………………………………….……... 19

C. The Summary Judgment Evidence Established
A Genuine Issue of Material Facts Regarding
Mote's First Amendment Association Claims …………………………... 19

   1. Mote and His Fellow Police Officers Have the Right
   To Association ………………………………………………….……… 19

   2. There is a Genuine Issue of Fact Concerning Walthall's
   Retaliation for Mote's Union Associational Activities …………………20

D. The Summary Judgment Evidence Established
A Genuine Issue of Material Facts Regarding
Mote's First Amendment Speech Claims ………………..………………. 29

   1. Mote's Speech is a Matter of Public Concern …….………………….. 29

E. The Summary Judgment Evidence Established
A Genuine Issue of Material Facts Regarding
Mote's Equal Protection Claims……………………………………..…… 31

   1. Is There a Misunderstanding of Plaintiff's
   Equal Protection Claims? ………………………………..…………….. 31

   2. Mote Has Shown Sufficient Summary Judgment

Evidence to Create a Genuine Issue of Fact
Concerning His §1983 Equal Protection Claim …………………………... 31

F.  Mote's Texas Labor Code §101.301 and
Government Code §1614.021 Claims
Should Not Be Dismissed …………………………………………………….. 33

1.  Walthall's Governmental Immunity
Defense is Not Valid ……………..…………………………………….. 33

2.  There is More Than Sufficient Summary Judgment
Evidence to Create a Genuine Issue of Fact Regarding
Defendant's Violation of Texas Labor Code §101.301 ………………… 34

G.  Plaintiff is Voluntarily Dismissing His
Texas Government Code §614.021 et seq. Claims ………………………… 34

H.  Plaintiff's Declaratory Judgment and
Injunctive Relief Claims Should Not Be Dismissed ………………………. 34

1.  Mote's Declaratory Relief Claims are Valid ……………………..…… 34

2.  Officer Mote's Injunction Requests Are
Essential Remedies And Should Not Be Dismissed …………………… 35

I.  There is a Genuine Issue of Facts Concerning
Defendant's Qualified Immunity Defense …………..………….………… 36

CONCLUSION …………………………………………………….…………… 39

CERTIFICATE OF SERVICE.............................................................................. 39

# INDEX OF AUTHORITIES

CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) …………….……….. 19-20

*Baker v. Norman*, 651 F.2d 1107 (5th Cir. Unit A July 1981) …………….…….. 39

*Bazan v. Hidalgo Cnty.*, 246 F.3d 481 (5th Cir. 2001) ………………….…..…… 38

*Bellard v. Gautreaux*, 675 F.3d 454 (5th Cir. 2010) …………………………. 32

*Boddie v. City of Columbus, Miss.,* 989 F.2d 745
 (5th Cir. 1993) …………………………………………………………….… 21

*Bolton v. City of Dallas*, 541 F3d 545 (5th Cir. 2008) …………………………... 33

*Celotex Corp v. Catrett*, 477 U.S. 317 (1986) ..................................................... 18

City Beaumont v. Bouillion 896 S.W.2d 143 (Tex. 1995) ………………...…...37

*City of Dallas v. Stanglin*, 490 U.S. 19, 190 S. Ct. 1591,
 104 L.Ed.2d 18 (1989) …………………………………………….…….…..20

*City of El Paso v. Heinrich*, 284 S.W.3d 366 (Tex. 2009) …………………...… 37

*Colorado County v. Staff*, 2017 WL 461363
(Tex. Feb. 3, 2017) ……………………………………………………….….. 35

*Connick v. Myers*, 461 U.S. 138 (1983) ………………………………..……... 30

*Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008) ………………………..…….31

*Estate of Davis ex rel. McCully v. City of N. Richland Hills*,
406 F.3d 375 (5th Cir. 2005) …………………………………………….. 33

*Findeisen v. North East Indep. Sch. Dist.*, 749 F.2d 234
(5th Cir. 1984) *cert denied,* 477 U.S. 1125 (1985) …………..…..…………..……19

*Foster v, Regis Trade Secret, Civ. A. No. 3:07-cv-694-O,*
2008 WL 731962 (N. D. Tex. Mar. 19, 2008) ……………………….…….19-20

*Freeman v. Madison Metro. Sch. Dist.*, 231 F3d 374
(7th Cir. 2000) …………………………………………………………… 29

*Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006) …………………………..……… 31

*Givhan v. Western Line Consol. School Dist.*,
439 U.S. 410, 99 S.Ct. 693 (1997)(Rehnquist, J.) ……………………….……… 30

*Gonzalez v. Benevides*, 774 F.2d 1295
(5th Cir. 1985) *cert denied,* 475 U.S. 1140 (1986) ………………………………. 30

*Hall v. Smurfit-Stone Container Enter., Inc.*,
*Civ. A. No. 3:07-cv-0501-G*, 2008 WL 3823252
(N.D. Tex. Aug. 14, 2008) ……………………………………….………… 19

*Harlow* 457 U.S. 800 (1982) ……………………………………….…..…….. 38

*Haverda v Hays Cnty.*, 723 F.3d 599 (5th Cir. 2013) …………………..……… 38-39

*Hayden v, Garden Ridge Management, LLC.*,
U.S. Dist. LEXIS 119726 (E.D. Tex. Dec. 22, 2009) ……………..…………… 27

*Hitt v. Connell*, 301 F.3d 240 (5th Cir. 2002) ……………………………….. 20-22

*Holland v. Shinseki*, 2012 U.S. Dist. LEXIS 6788
(N.D. Tex. Jan. 18, 2012) ………………………………………..…………… 27

*Lee v. Kansas City Ry. Co.,* 574 F.3d 253  ……………....…..………………….. 29

*Lowell V. City of Baytown*, 356 S.W.3d 499
(Tex.2011)(per curiam) ………………………………………….……………… 37

*Kostic v. Texas A&M Univ. at Commerce*,
11 Supp.3d 699, (N.D. Tex. 2014) ……………………………..……………….. 39

*McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) ………………... 38

*McConney v. City of Houston*, 863 F.2d 1180
(5th Cir. 1989) ……………………………………………………..…… 33

*Michalik v. Hermann*, 422 F.3D 252 (5th Cir. 2005) …………………….……… 38

*Monell v. Dep't of Social Services,* 436 U.S. 658 (1978) ……………………….. 32

*Patel v. Tex. Dep't of Licensing & Regulation*,
469 S.W.3d69 (Tex. 2015) …………………………………………..…….. 37

*Petrie*, 2013 U.S. App. LEXIS 22221, 2013 WL 5835612
(5th Cir. 2013) ……………………………………….…………………..…… 39

*Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) …………………...... 33

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) ……………...….. 33

*Reeves v, Sanderson Plumbing Products, Inc.,*
530 U.S. 133 (2000) …………………………………………….….….. 19-20

*Sharp v. City of Houston*, 164 F.3d 923 (5th Cir. 1999) ….…………..…..……… 22

*Smith v. City of St. Martinville*, 575 Fed. Appx. 435
(5th Cir. 2014) ……………………………………………...… 29-30

*Trevino v. UPS*, 2009 U.S. Dist. LEXIS 98738,
(N.D. Tex. Oct. 23, 2009) ……………………………………………..…… 27

*Thompson v. City of Starkville*, 901 F.2d 466 (5th Cir. 1990)……………...… 30-31

*Villalon v. Del Mar College Dist.*,
2010 U.S. Dist. LEXIS 82766 (S.D. Tex. Aug. 13, 2010) ….…………..……… 27

*Woodard v. Andrus*, 419 F.3d 348 (5th Cir. 2005) ……………………………… 33

*World Wide St. Preachers Fellowship v. Town of Columbia*,
591 F3d 747 (5th Cir. 2009) …………………………………………….. 32

## TEXAS CONSTITUTION, STATUTES, AND RULES

Fed. R. CIV. P. 56(c) ……………………..………………………….…... 18-19

First Amendment ………………………………………….….. 17, 20-21, 30, 39

Tex. Civ. Prac. & Rem. Code §101.106(e) ……………………………….…….. 34

Tex. Gov't Code §614.12 …………………………………………….......... 20

Tex. Gov't Code §614.021 ……………………………………….….… 18, 35

Tex. Gov't Code §617.002………………………………………….…….... 20

Tex. Labor Code §101.301………………………………………………… 18, 34-35

42 U.S.C. §1983 …………………………….………………….. 18, 32-33, 38

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **MARCUS MOTE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | **ACTION NO. 4:16-CV-00203-RC** |
| | § | |
| | § | |
| **DEBRA WALTHALL,** | § | |
| | § | |
| **Defendant.** | § | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENTAND BRIEF IN SUPPORT**

---

**TO THE HONORABLE JUDGE:**

Plaintiff Marcus Mote ("Mote" or "Plaintiff") files this his response to Defendant Debra Walthall's motion for summary judgment and brief in support.

## I. INTRODUCTION

Officer Marcus Mote filed this lawsuit in connection with the blatant and retaliatory actions of his employer, the City of Corinth, by and through Police Chief Debra Walthall, after Walthall discovered that Mote was leading the drive to form a union or association of the City's police officers. These actions included the pretextual internal affairs investigations that eventually resulted in retaliatory actions of alleged poor performance, transfer to deep nights shift, written reprimand, and termination.  These actions are clear violations of Officer Mote's first amendment free speech and association rights and fourteenth amendment equal protection rights, as well as statutory violations of federal and state laws. Despite Walthall's arguments to the contrary, Officer

Mote can easily demonstrate that there are genuine issues of fact which require a trial on the merits, and her motion for summary judgment should be denied.

## II. STATEMENT OF DISPUTED FACTS

In late January 2015, Mote and Corporal Jason Foutch informed Walthall of their intent to start an association during individual meetings in her office.  At the meetings, Mote and Foutch stated the vision and mission statement of the intended association.  They explained that the association would stay positive and serve to assist the administration.  They told her that the association would support the officers, their families, and the community, and promised her that the association would never be anti-administration and would never serve a purpose as being head hunters.  The Chief stated that as long as they stayed positive and true to this mission statement, she would support them and they would "have her blessing." *Pl's Ans. To D's First Set Int., No. 7.*

A few days later, on January 24, 2015, Mote sent out an e-mail to the department, including all Sergeants, Corporals and Officers.   In the e-mail, Mote restated exactly what was communicated to Walthall as to the foundational mission statement of the association and that Chief Walthall agreed to support and bless the association and officer's involvement.  However, after this e-mail was released, Sergeants came to Mote and stated that they took a copy of Mote's e-mail to Chief Walthall and she denied ever discussing the mission statement of the association with Mote and giving her blessing.  *Pl's Ans. To D's First Set Int., No. 7.*

On January 28, 2015, Lt. Frank McElligot called Mote into his office for a private meeting. McElligot repeatedly asked Mote about the goals of the association and asked Mote to provide details and paperwork of agenda items for the association.  Mote verbally offered examples of goals of the association, including teaming up with the Lake Cities Fire Association to have a

softball charity game and establishing a Corinth Police Chaplin to offer support for officers. Mote, however, refused to provide paperwork regarding association planning and reminded McElligot that the association was not even formed yet. McElligot repeatedly attempted to persuade Mote not to start an association and that "the association is not needed." *Mote Depo. 99-100,121, Depo. Ex. 14.*

The very next day, January 29, 2015, Sgt. Ventrca spoke with Mote about the association. In this conversation, Ventrca repeatedly attempted to convince Mote that "the association is not needed." Ventrca asked several questions regarding information he had heard and Mote corrected the lies and rumors. Mote assured Ventrca that the vision of the association was not to be confrontational, but to build comradery. Despite these assurances from Mote, Ventrca told Mote that he was concerned for Mote's well-being, that it would be detrimental to Mote's career to continue in trying to start the Association. *Mote Depo. 99-100,110, Depo. Ex. 14; Pl's Ans. To D's First Set Int., No. 7.*

On January 30, 2015, Sgt. Tyson cornered Mote in the back of the sergeant's office with the doors closed and verbally yelled at Officer Mote for 45 minutes regarding Mote's involvement with the association. This incident occurred in the presence of Sergeant Randy Robinson, Sergeant Joe Wheat, and Lieutenant Jimmie Gregg. Robinson was working at his desk when Mote entered the sergeant's office. Robinson never participated in the conversation and was visibly uncomfortable with the incident. Robinson quietly walked out of the office to remove himself of the situation while Tyson was yelling at Officer Mote. Tyson was extremely negative about the idea of an association and Mote's involvement. Wheat and Gregg participated in the conversation and voiced their negativity about the association. Mote stayed calm toward Tyson and attempted to answer all his questions and reassure him of the association's positive mission statement.

Nevertheless, Tyson continued to yell at Mote and after 45 minutes, Mote excused himself and walked out. *Mote Depo. 99-100,116-17, Depo. Ex. 14; Pl's Ans. To D's First Set Int., No. 7.*

Mote met privately with Lieutenant Jimmie Gregg after work in the police department gym a few days after the Tyson incident.  Mote asked Gregg why all the admin were so negative about starting an association when Gregg himself previously ran the last association.  Gregg stated that the Chief and admin were worried about the association going negative due to negative morale among many of the officers. Mote stated that Gregg knew Mote's attitude and that Mote had always shown a history of being positive toward the police department and admin.  Gregg agreed that this was true of Mote's history.  Gregg stated that the concern was that other officers would negatively influence the association.  Mote stated that as long as Mote and Foutch were leading the association that they would not allow the association to go negative.  Gregg stated that he was personally not concerned about Mote and Foutch, but that Mote needed to be careful about allowing other officers involvement or things would get ugly. *Mote Depo. 119-21; Pl's Ans. To D's First Set Int., No. 7.*

Several members of the command staff that were upset about Mote's actions in sending the January 25 e-mail and the goals of the association made their displeasure known to Walthall. Walthall specifically recalled that Tyson and Wheat told her about the Mote e-mail and the association, that they did not agree with the goals listed in the e-mail, and voiced how upset they were about it. *Walthall Depo. 55:7-57:15.*

Mote then returned to Walthall's office for a second meeting on February 4 after the intense negativity from the command staff.  Mote informed Walthall that Sergeants were saying that she was denying her support of the association and denying that she and Mote had ever discussed what was stated in the e-mail. Walthall stated that the sergeants brought her a copy of the association

announcement e-mail and asked her if the contents in the e-mail were true regarding the meeting with Mote and Chief. Walthall stated that she told the sergeants that she did not remember Mote discussing with her the main talking points for the association. Walthall essentially changed her story and told Mote that she never discussed the mission statement of the association with Mote at the first meeting and never gave her blessing. This was appalling to Mote as that was the only thing discussed in the first meeting with Walthall. *Mote Depo. 99-100, Depo. Ex. 14; Pl's Ans. To D's First Set Int., No. 7.*

Mote restated the mission statement bullet points and again asked Walthall if she would support the association. Walthall then said reluctantly that she was okay with an association as she could not deny officers' right to start an association but believed there was a better way to accomplish officers' goals. Walthall stated that when she was with the City of Allen, she helped start the officer association there, but as she promoted up she later became uninvolved in the association. She also emphasized that the Allen association then later became very negative and, in her belief, ineffective. *Mote Depo. 99-100, Depo. Ex. 14; Pl's Ans. To D's First Set Int., No. 7.*

Mote then asked if she would support officers individually in their attempt to start the association as long as the officers stayed positive and true to the mission statement. Chief replied that as long as the association stayed positive she would support the association, but if the officers ever went negative then "things will get ugly." Mote asked Chief to issue a statement or e-mail to the department to clarify her support of the association. Walthall agreed, but no statement of support, either verbally or in writing, was ever submitted. *Mote Depo. 99-100, Depo. Ex. 14; Pl's Ans. To D's First Set Int., No. 7.*

On February 11, 2015, TMPA conducted an informational meeting open to Officers, Corporals, Sergeants, and Lieutenants. In attendance were Clint McNear, a TMPA rep, Chris

Livingston, a TMPA attorney,  Lt. Frank McElligot, Sgt. Clint Ventrca, Sgt. Joe Wheat, Officer Marcus Mote, Corporal Jason Foutch, Corporal Ryan Brock, Officer Jessie Gonzalez, Officer Michael Fraga, Officer Carson Crow, and Officer Lee Thompson (came in at the end of meeting). *Mote Depo. 79-82, 99-100, Depo. Ex. 14; Pl's Ans. To D's First Set Int., No. 1.*

Two days later, Walthall e-mailed Assistant Chief Greg Wilkerson, Lieutenant Carrie West, and Internal Affairs Lieutenant Jimmie Gregg an article regarding a management survey conducted by TMPA in Edinburg, Texas that was critical of the police department administration in that city. Walthall wrote:

> "Check the article on Edinburg PD. This is exactly what TMPA will lead our guys to. This is the same survey that they did years ago on Allen PD."
> (emphasis added)

Walthall's extreme displeasure with the article was very clear from the above-referenced e-mail. Walthall had previously worked for the Allen Police Department when a TMPA management survey which was critical of police administration was provided to the Allen City Council. *Walthall Depo., 52:9-58:9, Depo. Exs. 13 & 14.* In fact, Walthall specifically stated that she did not "like the dissension that it leads to in the department and with your community." *Walthall Depo. 53:1-53:9.*

On February 26 the TMPA announced the vote results regarding forming an association. The majority voted to have an association comprised of silver badges only (Officers and Corporals).  Sergeants learned they have been voted out of being included in the association and become upset.  The majority of officers did not want Sergeants a part of the association because they believed the sergeants would try to tear it apart from the inside.  Sergeants begin increasing their negativity and attacks on the association. *Mote Depo. 82, 99-100, Depo. Ex. 14.*

The beginning of the petty and retaliatory write-ups started on February 27, just four weeks after Tyson yelled at Mote concerning forming a union, just three weeks after the meeting with the TMPA rep and attorney, and just one day after the voting results were announced. On February 27, Sgt. Tyson verbally reprimanded Officer Mote about his squad car not being properly washed and cleaned when it was retired on the previous Tuesday.  In response, Mote stated that due to icy and freezing conditions, the car washes had not been open.  Mote apologized and told Tyson that if he had known it was important to wash the car before it was retired, he would have done so on the following day. *Mote Depo. 99-100, Depo. Ex. 14.*

On March 10, TMPA rep Clint McNear sent an e-mail to Officers and Corporals of the new Association to vote on the Association name. While Association e-mails are only now sent to all Officers and Corporals, someone is leaking the Association e-mails to command staff because sergeants and admin began discussing it with Officers and Corporals. *Mote Depo. 99-100, Depo. Ex. 14.*

On March 10, Sgt. Tyson and Lt. West gave Mote a "poor performance" write-up stating that he failed to properly clean the car that was retired from two weeks before. Officer Mote agreed that the exterior of the car was dirty due to poor weather conditions at the time, but also stated that he fully cleaned out the interior of the vehicle. Mote said he did not take it to the car wash as he was told by Sgt. Tyson to park and down the car immediately due to mechanical problems.  Mote then asked what was dirty about the interior of the car, but was not given a specific answer.  The squad had already been retired and removed from the PD parking lot and was unavailable to be inspected at the time.  *Mote Depo. 27-29, 99-100, Depo. Ex. 14.*

On March 11, Lt. Carrie West called Mote into her office. Upon walking into her office, Mote observed a fully completed performance improvement form ("PIF") form sitting directly in

front of her on her desk. West asked Mote about whether he had any work-related social media accounts. Mote informed her that he had Instagram and Twitter accounts in connection with his job responsibilities as a School Resource Officer ("SRO"). West then asked if Mote received permission to start the accounts. Mote answered yes, and explained that Officer Lance Stacy (SRO at Myers Middle School) and Mote spoke with Lt. Gregg about possibly starting social media accounts at the beginning of the 2013-2014 school year.  Officer Stacy and Mote had just returned from an SRO training in which it was highly recommended that SROs start a social media account for the purposes of connecting with their students as well as watching for criminal behavior. Mote explained that both Lt. Gregg and Assistant Chief Wilkerson gave Stacy and himself permission to open an SRO Instagram and/or Twitter account but did not want them opening an SRO Facebook account. Officer Stacy and Mote both complied with their order and only started SRO Instagram and Twitter accounts. Upon Mote informing Lt. West that they received permission from Assistant Chief Wilkerson and Lt. Gregg to start the Instagram account, Mote observed Lt. West move items from her desk to cover up the PIF form. Mote left the office without a PIF. *Mote Depo. 99-100, Depo. Ex. 14.*

On March 14, Officer Mote discovered that Sgt. Tyson was inspecting his patrol car after many of his patrol shifts in an attempt to locate any problems. This is not a practice that is conducted with any other officers. Sgt. Tyson actually documented that he found a screw in the front passenger tire of Mote's Unit 468 vehicle. On March 18, Lt. West called Mote into her office and gave Mote a verbal reprimand regarding not conducting a full inspection of his patrol car and documenting it on the patrol sheet. This alleged incident was reported by Sgt. Tyson. *Mote Depo. 99-100, Depo. Ex. 14.*

On March 19, McNear, the TMPA rep, announced that the voting results for the name of the association resulted in the name to be the "Corinth Police Officers Association." The next day, on March 20, Walthall sent out an e-mail to all Corinth officers stating that they were not to speak to any current or running City Council candidates regarding anything about the police department. *Mote Depo. 99-100, Depo. Ex. 14.*

On March 24, Walthall sent out a notification that the position of bailiff was being be eliminated from the PD budget, and that Officer Jessie Gonzalez would be reassigned from court bailiff to patrol officer. Officer Gonzalez attended the initial TMPA meeting attended by Clint McNear and observed by Lt. McElligot. *Mote Depo. 99-100, Depo. Ex. 14.* Gonzalez was also going to be the Secretary of the Association, but never took the office because he was scared of retaliation. *Mote Depo. 90.*

On March 30, Corporal Foutch was informed that he was being removed as Senior Criminal Investigator after 12 years in that position, and reassigned to Patrol as a Corporal due to alleged understaffing and the need for supervisors in patrol. Corporal Foutch was assigned to work Day shift beginning April 20. Corporal Foutch was later moved to night shift at the beginning of July. *Mote Depo. 99-100, Depo. Ex. 14.* Foutch was President of the Association. *Mote Depo. 90.*

Due to the retaliatory actions that the command leadership was taking against Mote and some of the other leaders of the association movement, the TMPA sent an e-mail to Walthall on March 30 with an attached letter from a TMPA attorney informing her of the rights of Corinth officers in forming an association without intimidation, coercion, or retaliation, and referencing prior acts of unlawful intimidation and reprisal by department leadership. *Walthall Depo. 58:23-61:14, Depo. Exs. 15 & 16.*

On March 31, the Association filed its certificate of formation with the State of Texas. *Mote Depo. 99-100, Depo. Ex. 14.*

On April 8, Lt. West and Sgt. Tyson issued Officer Mote a Performance File Documentation stating that while working security at the Corinth Easter Egg Hunt, he failed to check on duty with his police radio. In response, Mote stated that for years he always checked on duty using his patrol car computer. However, since he did not have a patrol car currently assigned to him, he simply forgot to check on with the radio. *Mote Depo. 99-100, Depo. Ex. 14.*

On May 7, the assistant principal of Lake Dallas High School asked Mote to conduct screening of prom guests who were not LDHS students and essentially unknown. Officer Mote asked the assistant principal what the SRO had done in the past regarding this process. The assistant principal informed Mote that the SRO runs the driver license records of the guest students to confirm that they are not registered sex offenders.  Officer Mote verified from the previous SRO (Shane Rodgers) that this is what had been conducted in the past for the high school and is normal. After getting that confirmation from Rodgers, Mote took the guest applications and ran the drivers license numbers on his patrol computer. Mote did not write any information on any of the applications and returned them to the assistant principal. Mote wrote a sad face on a sticky note on one student application. Mote explains to the assistant principal that all applications were clear and passed, but that one guest did have an arrest record which was located on the Denton County Jail public website. Officer Mote recommended that the Principal be informed of this arrrst so that the guest could be watched closely if allowed to attend. *Mote Depo. 99-100, Depo. Ex. 14.*

On May 8, Mote learned that the principal chose to not allow that individual to attend the high school prom with a LDHS student due to his recent arrests that Mote discovered on the Denton County Jail public website. The parent of this individual and the parent of the LDHS student

complained to the principal that they did not agree with the SRO (Mote) making the decision to

not allow the individual to attend the private school event.  The principal stated that it was her

decision to not allow the individual to the school event, and not the SRO's decision.  The principal

further stated that the SRO simply informed her of the arrest incident that he had found on the

Denton County Jail website.  *Mote Depo. 99-100, Depo. Ex. 14.*

At the end of his shift, Mote told Lt. Gregg what occurred regarding running the guest

driver licenses for those who wanted to attend the prom with a LDHS student. Mote informed Lt.

Gregg that the purpose of running the driver licenses was to screen for sex offenders, known gang

members, and protective orders. Mote stated that he wanted Lt. Gregg informed just in case the

parent complained. Mote told Gregg that the parents were not aware of the criminal mischief arrest

that had occurred only a month earlier with the individual, and after learning this information, the

parents were much more understanding. Gregg informed Mote this was not a problem and actually

thanked Mote for informing him. About thirty minutes later, however, Gregg called Mote and

stated that he was not sure that Mote should be running driver licenses for this purpose and told

Mote not to do that in the future until further reviewed. In response, Mote stated that this has been

the SRO practice for assisting the school for over five years and he was just doing what he had

been told was done in the past. Mote informed Gregg that other high schools conduct the same

drivers' license screening for their prom events, but also agreed not to conduct such screen for the

school again until the practice could be reviewed for the future. *Mote Depo. 99-100, Depo. Ex. 14.*

On May 11, Lt. West confronted Mote at LDHS as she left a meeting with the principal.

West asked Mote about the driver license screening and asked him if he has the prom application

forms that were used when running the screening. Mote stated that he turned the applications back

into the school but that she could look at his patrol laptop to see the individuals for whom a driver

license check was run. Mote opened his computer to the screen that showed the names of the individuals, and West immediately confiscated his computer without further discussion. West told Mote to leave the school and return to the police department.  Upon arrival at headquarters, Walthall informed Mote that he is guilty of wrongful usage of the TLETS system regarding running driver licenses, he could face criminal charges, she knows he disseminated the information, and he is guilty of these actions. Walthall also told Mote that was being permanently removed as SRO and assigned to patrol and can expect to at least receive days off for the incident. The Chief then informs Officer Mote that an internal affairs investigation will begin.  Officer Mote is surprised by the fact that he is already being removed as an SRO, tried and convicted by Walthall, and yet the investigation was just now beginning. On May 14, West escorted Mote to the LDHS SRO office by to clean out his office while West watches. Officer Mote feels like he is being treated like a terminated employee and demeaned in front of LDHS staff. *Mote Depo. 99-100, Depo. Ex. 14.*

On June 10, TMPA rep Clint McNear sent an e-mail to the department informing the entire department of the voting results of the CPOA board and who the five CPOA board members were, including Mote being listed as Treasurer. *Mote Depo. 90, 99-100, Depo. Ex. 14.* On that same date, Walthall finally issued Mote a letter of Complaint regarding the driver license check, IA #2015-001.  The letter of complaint was issued thirty days after the investigation was initiated on May 11.  A letter of complaint is usually issued within the first week that an investigation is started. The IA department essentially spent thirty days on a witch hunt looking for things to investigate on Mote.  After thirty days of digging dirt on Officer Mote, the letter of complaint was issued which was four pages of frivolous incidents. *Mote Depo. 99-100, Depo. Ex. 14.*

On June 16, Walthall announced the persons who would get SRO assignments for the 2015-2016 school year. Since Mote was under an IA, he did not have the opportunity to obtain an SRO position. *Mote Depo. 99-100, Depo. Ex. 14.*

On July 1, Walthall issued an updated letter of complaint for IA #2015-001, which alleged that Officer Mote was using his CPD-issued laptop for personal use while on duty and off duty. The complaint alleged that Officer Mote violated an e-mail issued by Lt. West requesting that officers try to limit their personal usage of CPD laptops. It was alleged that Mote was in violation of personal usage when he looked at the Zillow website while working Ashton Gardens for the purpose of researching what price to sell his residence for.  Also when Lt. West confiscated Officer Mote's laptop, Officer Mote was in the process of completing an e-signature contract for the sale of his residence.

Officer Mote responded to this complaint by informing Assistant Chief McElligot that Lt. West's e-mail was discussed in the support services briefing days later, and she was asked exactly how they wanted officers to use or not use computers. Lt. West did not provide any specific clarification on how officers needed to change their computer usage behavior.  Officer Mote spoke with Sgt. Wheat, who managed the CPD computers and had previously stated there was an increase in data usage on SRO computers. Mote asked Wheat what he needed to do differently so as not to cause a problem or increased cost for the department. Mote discussed with  Wheat all the ways he used the laptop including on duty usage, off duty usage while working Ashton Gardens, and only a handful of times had used the computer at home to pay bills when internet was down at his residence. Sgt. Wheat told Mote that he could use the laptop for personal use when on duty and off duty at Ashton Gardens, but to no use it at home again in the future.  Mote agreed and never again used the CPD laptop at his residence to pay bills. *Mote Depo. 99-100, Depo. Ex. 14.*

On July 24, Walthall called in Mote and accused him Mote of violating his Garrity warning by speaking to Corporal Foutch about the IA. The Chief claimed that Mote was not allowed to talk to Corporal Foutch, as Corporals are NOT in the chain of command. Mote argues this point with Walthall and stated that Corporals have always been in the chain of command at the department, and Corporal Foutch is Officer Mote's direct Corporal on his assigned patrol shift. The Chief stated that the issue is being reviewed by the city attorney, and she placed Mote on Admin Duty effective immediately.  *Mote Depo. 99-100, Depo. Ex. 14.*

Later on that same day, the Chief issued a letter to Mote suspending him from all off duty work indefinitely due to Mote working Ashton Garden shifts for Corporal Foutch. Corporal Foutch would sign his name for Ashton shifts and if he chose not work the shift, he would allow Officer Mote to work the shift in his place. Corporal Foutch allowed Mote to work his shifts as he was increasingly busy with his softball schedule and did not always know his schedule until the last minute. Mote worked these extra shifts in order to get out of debt and fix up his house so that he could sell it in the spring. When Mote sold his house in June, he stopped working the extra shifts for Corporal Foutch.

Walthall alleged that Mote violated an e-mail from Lt. Gregg that was issued 1 ½ years earlier that stated when an officer wants to "remove" his name from an off duty list, the officer must first get a supervisor to approve for his name to be removed. Mote stated that the Lt. Gregg e-mail did not apply because (1) no one was ever removing a name from the list leaving the spot unfilled, and (2) Mote was covering the off duty shifts for a supervisor (Corporal Foutch), which Foutch had approved. The context of the Lt. Gregg e-mail was written due to an officer removing his name from an off duty court security assignment, which resulted in no person working the court security shift. Lt. Gregg verbally told all officers that if an officer did not want to work an off duty

assignment for which an officer signed up, then it is that officer's responsibility to find another officer to work it in his place.  If an officer could not find a replacement and the officer still wanted to remove his name from the list and leave it unfilled, then the officer must then get supervisor approval to remove his name from the off duty list. Despite the fact that Mote had easily explained that he was not in violation of the Gregg e-mail, Walthall maintained that Officer Mote and Corporal Foutch violated the Gregg e-mail, and suspended both Mote and Foutch from working all off duty indefinitely. This resulted in a loss of over $20,000 per year in income for Officer Mote. *Mote Depo. 99-100, Depo. Ex. 14.*

On July 30, Walthall issued Mote issued a written reprimand for all of the allegations of IA #2015-001. Shane Rodgers, the officer who told Mote that he could check driver licenses of prom guests, was issued a written warning, which can be removed after one year under departmental general orders. Walthall also issued the complaint against Mote for IA#2015-002 (the juveniles incident) immediately after the conclusion and signing of his IA document for IA#2015-001.

The juvenile incident was a regular, particularly simple incident that occurred while Mote was working on routine deep-nights patrol. Mote explained it in his deposition as follows:

> So I'm on night shift like we talked about. I'm driving through, it's late at night and kind of a normal thing I did on Patrol was, because there's not alot going on in the City late at night, I just drive the hoods look for anything, you know.  And so I was driving down this street, it was Pine Hills, I had the windows down, radio off, so it was just dark and quiet, you know, I can look and listen. Slow rolling, look and listen, looking left, looking right, just seeing what I can see.
>
> And this house in question, the 1601 Pine Hills, I actually just passed it and as I'm just looking left, looking right, I see two females -- well, at first I didn't know they were females, but I see two people sitting in the grass kind of up on the lawn. They're just sitting there. So I

stop and kind of lean forward and I look out my passenger window to see them and they're not doing anything. So I asked what are y'all doing? And they said, oh, we just came -- we're okay, we just came outside to talk. We'll go back inside.

I was like, okay. And as we're talking they're going ahead and standing up and starting to walk back.  I was like, so y'all live here? And they're like, yes, we live here.  I'm like, oh, okay. And they're continuing to walk toward the front door. Because of the angle now, I can't really see them, because I'm more just past the driveway and there's vehicles in the driveway and the brick mailbox. So to get a better positioning, I just did -- it's a big wide street, I just hooked a U right there and then pulled right in front of the house now, right in front of the -- so I could see straight to the front door. Now, they're standing at the front door but they haven't gone in yet.  So I said, are y'all locked outside? And they said, yes, but he will let us back in. Okay, I mean, that's a very specific answer. So I'm like, well, we're about to find out if what they're telling is the truth; either this is their house or it's not their house or they're going to go in or as they say, he will answer the door. And right then a guy answers the door, he opens it all the way, he's fully dressed, he greets them, I can see the mannerisms and I could faintly hear them. He acts as if he knows them, it sounded like he said something like, why are y'all outside, come back in. And then he motions to me, kind of like points toward my vehicle and said why are the police here or the cops here, something like that.  So then I spoke up and I said I just wanted to make sure they got inside safe. He said, oh, okay, and they all walk in, he waves to me and says thanks or something like that and they all go inside and close the door.
*Mote Depo 49:14-51:15.*

Within a short time, the homeowner called 911 and stated that the juveniles had been drinking and did not live at the location. Mote immediately returned to the residence and a Sgt. Ventrca came out to the location. The juveniles were issued citations. One juvenile was released to her parents. The other juvenile was transported to a local hospital where her parents picked her up.

Mote confirmed with his supervisor, Sgt. Ventrca, who was at the scene, that this was a simple misunderstanding and entirely reasonable:

And he seemed understanding that it was reasonable and plausible
for the misunderstanding, and we talked about it and that was it.
*Mote Depo. 69:10-69:12.*

Despite the confirmation that Mote's actions were reasonable from the supervisor at the scene,

Walthall, by memo dated October 20, 2015, terminated Mote for the incident.

Based upon all of the hostile behavior from Walthall and her command staff as described

above, numerous Corinth officers were afraid of being involved in the association. Jessie

Gonzalez, who was slated to be the Secretary of the association, told Mote that he was too scared

to step forward. *Mote Depo. 90-91.* The association actually effectively evaporated by October

because everyone was too scared. *Mote Depo. 98.* Several officers (over ten officers) told Mote

that they were being intimidated and/or scared by Sergeants talking negatively about the

association and seeing what was happening to Mote. *Mote Depo. 100-110.* In fact, Michael Fraga,

a Corinth officer, would blurt out "dead man walking" when Mote came into a room. *Mote depo.*

*109.*

Other officers of the department also testified about the fear and uncomfortable

environment of what was happening to Mote and other leaders of the association movement. *See*

*Rachel Roberts Depo. 17-19; Mario Merendon Depo. 13-16, 20; Michael Fraga Depo. 20, 24-27,*

*30; Carson Crow Depo. 37-39, 43-48.*

### III. STATEMENT OF ISSUES

1.    The summary judgment evidence establishes a genuine issue of material fact regarding
      Mote's first amendment association claims. Mote and his fellow police officers have the
      right to association. There is a genuine issue of fact concerning Walthall's retaliation for
      Mote's union associational activities.

2.    The summary judgment evidence establishes a genuine issue of material fact regarding
      mote's first amendment speech claims. Mote's speech is a matter of public concern.

3.      Mote has shown sufficient summary judgment evidence to create a genuine issue of fact concerning his §1983 equal protection claim.

4.      Mote's Texas Labor Code §101.301 claims should not be dismissed. Walthall's governmental immunity defense is not valid. There is more than sufficient summary judgment evidence to create a genuine issue of fact regarding defendant's violation of Texas Labor Code §101.301.

5.      Plaintiff is voluntarily dismissing his Texas Government Code §614.021 *et seq.* claims.

6.      Plaintiff's declaratory judgment and injunctive relief claims should not be dismissed. Mote's declaratory relief claims are valid. Officer Mote's injunction requests are essential remedies and should not be dismissed.

7.      There is a genuine issue of fact concerning defendant's qualified immunity defense.

## IV. EVIDENCE

Exhibit 1      Plaintiff's Objections and Answers to Defendant's First Set of Interrogatories

Exhibit 2      Deposition excerpts of Marcus Mote

Exhibit 3      Deposition excerpts of Chief Walthall

Exhibit 4      Deposition excerpts of Rachael Roberts

Exhibit 5      Deposition excerpts of Mario Merendon

Exhibit 6      Deposition excerpts of Michael Fraga

Exhibit 7      Deposition excerpts of Carson Crow

Exhibit 8      Plaintiff's Designation of Rebuttal Experts

## V. ARGUMENT AND AUTHORITIES

### A.    The Parties' Burdens on Summary Judgment

Federal Rule of Civil Procedure 56 should be construed "with due regard […] for the rights of persons asserting claims adequately based in fact to have those claims and defenses tried to a jury ...." *Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).*  The Fifth Circuit has cautioned that summary judgment is a "potent weapon" and that "courts must be mindful of its aims and targets

and beware of overkill in its use." *Findeisen v. North East Indep. Sch. Dist.*, *749 F. 2d 234, 239 (5th Cir. 1984)* (internal quotations omitted), *cert denied, 471 U.S. 1125 (1985).*  Courts should consequently be particularly circumspect where—as here—a case is scheduled for jury trial.  *Id.*

Summary judgment is appropriate only where the record contains no genuine issue as to any material fact, meaning that the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. *56(c); Foster v. Regis Trade Secret, Civ. A. No. 3:07-cv-694-O, 2008 WL 731962 (N.D. Tex. Mar. 19, 2008).*  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Foster, 2008 WL 731962 at (N.D. Tex. Mar. 19, 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).*

Walthall, as the moving party, bears the initial burden of showing its entitlement to judgment as a matter of law.  *Id.*  It cannot meet this burden with the conclusory assertion that probative evidence does not exist.  Rather, it must show—through competent evidence—the absence of genuine material fact issues and that it is entitled to judgment as a matter of law.  *Hall v. Smurfit-Stone Container Enter., Inc.*, *Civ. A. No. 3:07-cv-0501-G, 2008 WL 3823252, *2 (N.D. Tex. Aug. 14, 2008).*

If it meets that burden, Mote must then point to record evidence demonstrating the existence of material factual disputes.  *Foster, 2008 WL 731962 at *2.*  As long as "reasonable minds could differ as to the import of the evidence," such that factual disputes remain, the motion for summary judgment must be denied.  *Id.  (quoting Anderson, 477 U.S. at 250).*

**B.**     **General Principles Governing the Court's Review of the Evidence**

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the Supreme Court unanimously confirmed the standard that courts must follow in assessing motions for summary judgment.  *Reeves* and earlier precedent instruct that the court must accept Mote's evidence as true

and must draw all reasonable inferences in his favor.  *Id. at 150-151; Liberty Lobby, 477 U.S. at 255.*  Meanwhile, the Court must avoid making credibility determinations in light of conflicting evidence or competing inferences.  *Foster*, *2008 WL 731962 at \*3 (citing Anderson, 477 U.S. at 255).*  For "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are functions of a jury at trial, not those of a judge in ruling as a matter of law.  *Reeves*, *530 U.S. at 150-151; see also Foster, 2008 WL 731962 at \*3* (noting that courts are not permitted credibility determinations when conflicting evidence is presented).

**C.    The Summary Judgment Evidence Establishes a Genuine Issue of Material Fact Regarding Mote's First Amendment Association Claims**

**1.    Mote and His Fellow Police Officers Have the Right to Association.**

On pages 10-11, Defendant makes the peculiar argument that Mote, as a public police officer, does not have a first amendment right of association. In support of this argument, she cites a case involving a city ordinance restricting admission to dance halls to persons between the ages of 14 and 18, *City of Dallas v. Stanglin, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989).* Quite obviously, a 16 year old looking to dance with other teenagers is not remotely close to police officers wanting to form a union or association to engage in employee advocacy and to petition the government.

Walthall also asserts that because Texas state law prohibits collective bargaining by public employees, such employees do not have the first amendment right to associate. See D's MSJ, p. 11 (citing TEX. GOV'T CODE §614.12, which actually is §617.002). Walthall, however, cites no case that supports such a statement. Indeed, the state of the law is directly contrary to Walthall's unsupported assertion.

It is well-settled law that the First Amendment protects a public employee's right to associate with a union. *Hitt v. Connell, 301 F.3d 240, 245 (5th Cir. 2002).* The Fifth Circuit has

made it clear that First Amendment association claims based on public employee union activity

are protected under the Constitution:

> The First Amendment protects the right of all persons to associate together in groups to further their lawful interests. This right of association encompasses the right of public employees to join unions and the right of their unions to engage in advocacy and to petition government in their behalf. Thus, the first amendment is violated by state action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do. Such protected First Amendment rights flow to unions as well as to their members and organizers.
> *Boddie v. City of Columbus, Miss., 989 F.2d 745, 749 (5th Cir. 1993).*

The facts in *Hitt* certainly make it quite clear that despite the fact that Texas law prohibits

unions from collectively bargaining with cities, such public employees are nevertheless protected

under the first amendment's association clause from retaliation for their union/association

activities. Hitt alleged, and a jury found, that his employment was terminated because the constable

of a city in Texas disapproved of Hitt's involvement with two affiliated labor unions, the Alamo

Area Peace Officers' Association and the Texas Conference of Police and Sheriffs. *Hitt at 243.*

Those associations certainly do not engage in collective bargaining, just like the CPOA.

Nevertheless, those associations were more than sufficient to support the plaintiff's successful first

amendment association claims. Pursuant to *Hitt,* Officer Mote's union organizing actions are

"constitutionally protected activities."

### 2.    There is a Genuine Issue of Fact Concerning Walthall's Retaliation for Mote's Union Associational Activities.

To state a First Amendment retaliation claim based upon union associational activity, a

plaintiff must establish three elements: (1) the plaintiff suffered an adverse employment decision;

(2) the plaintiff's interest in organizing outweighed the governmental defendant's interest in

promoting efficiency; and (3) the protected organizing activity motivated the defendant's conduct.

*Hitt at 245*. "Adverse employment decisions include discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Id.* (quoting *Sharp v. City of Houston, 164 F.3d 923, 933 (5th Cir.1999))* (internal quotations omitted).

Walthall argues that Mote cannot prove the third prong of the *Hitt* analysis in which a plaintiff must demonstrate that the protected organizing activity motivated the defendant's conduct. *See D's MSJ, pp. 11-12*. Although Defendant paints this burden as a high one, the actual law on summary judgment is not nearly as draconian. At the summary judgment stage, the question is not whether Mote can prove that the protected organizing activity motivated the Chief's conduct, but rather whether Mote can establish a ***genuine issue of fact*** as to whether the numerous adverse actions that Mote began experiencing were motivated by Mote's organizing activity.[1]

Throughout her motion and brief, Walthall ignores all of the compelling evidence showing Walthall and her supervisors' outright hostility (1) to the formation of a union association, and (2) to the leaders of the movement to form a union association. The hostility to the formation of an association and the leaders of that movement convincingly show that there is a genuine issue of fact that Mote's associational activities motivated Walthall's decision to terminate Mote.

As clearly shown in the Statement of Disputed Facts, the intense scrutiny and severe opposition to Mote's efforts at forming an association commenced immediately after Mote made his plans known to the administration. The string of negative conversations with department leadership is, frankly, incredible in this case.

As soon as Mote told Walthall of his plans for the association, Walthall gave Mote lukewarm approval when she said she would support his efforts on the condition that the

---

[1] For some unknown reason, Defendant's motion for summary judgment only addresses the termination aspect of Mote's claims, and does not address the other retaliatory actions leading up to the termination. As such, the court may not consider those viable claims against Defendant on this motion.

association stayed positive. *See p. 2, supra.* Several Sergeants related to Mote that Walthall was even denying her lukewarm support of the association after Mote sent an e-mail describing the mission statement of the association. *Id.* McElligot, who was a Lieutenant at the time, repeatedly questioned Mote about the association, repeatedly tried to convince Mote not to form an association, and told Mote that an association was not needed. *See pp. 2-3, supra.*

The day after getting bombarded by McElligot, Sgt. Ventrca talked with Mote, again repeating the company line that an association was not needed. *See p. 3, supra.* Although Mote tried to assure Ventrca that the association would not be confrontational, Ventrca Mote that he was concerned for Mote's well-being, that it would be detrimental to Mote's career to continue in trying to start the Association. *Id.*

Mote's conversation with Sgt. Tyson the next day ramped up the intense retaliation that Mote had to endure. *See pp. 3-4, supra.* Tyson yelled at Mote for no less than forty-five minutes regarding Mote starting an association, and was extremely negative about the association and Mote's involvement in it. *Id.* Sgt. Wheat also voiced his negativity regarding the association during this incident. *Id.* Just a few days after Tyson's tirade, Lt. Gregg told Mote that the Chief and the admin staff were worried about the association going in a negative direction because of the negative morale of many officers, and warned Mote that if the association turned negative, things would get ugly. *See p. 4, supra.*

Due to the intense pressure and negativity from the command staff that Mote was dealing with, Mote had another meeting with Walthall. *See pp. 4-5.* In this meeting, Walthall told Mote that when she was with the City of Allen, the Allen police officers association was very negative. *See p. 5, supra.* Once again, Walthall said as long as the association stayed positive she would support the association, but warned Mote that if the association went negative, then "things will

get ugly." *Id.*

Walthall's negative attitude about Mote's associational activities was now on full display. Indeed, unbeknownst to Mote, Walthall confirmed her hostility to the association when she sent an e-mail to some of her command staff about a management survey that a TMPA affiliate association had conducted in Edinburg, Texas that was critical of the police department administration there. *See p. 6, supra.* She stated in the e-mail that "this is exactly what TMPA will lead our guys to." *Id.* In her deposition, Walthall did not hide her animus against associations when she said that she did not "like the dissension that it leads to in the department and with your community." *Walthall Depo. 53:1-53:9.*

The TMPA announced that the officers wanted an association and that members could be only Officers and Corporals. *See p. 6, supra.* Once that vote was known, the excluded command staff started increasing their negativity and attacks on the association and Mote himself. *Id.* The retaliatory write-ups and reprimands of Mote began in earnest thereafter. Tyson gave Mote a verbal reprimand followed by "poor performance" write-up with no foundation whatsoever. *See p. 7, supra.* Lt. West was prepared to give Mote a performance improvement form on one occasion, but decided not to give it to him because Mote sufficiently proved that his actions were authorized by a supervisor. *See pp. 7-8, supra.* Mote observed Tyson inspecting Mote's patrol car, looking for something to discipline him for. *See p. 8, supra.* One of these witch hunts resulted in Mote getting a verbal reprimand from Lt. West. *Id.*

By this time, other leaders of the association were getting punished for their actions with the association. Walthall reassigned Jessie Gonzalez from court bailiff to patrol officer. *See p. 9, supra.* Additionally, Jason Foutch, who had been in the position of Senior Criminal Investigator for twelve years, was suddenly moved to patrol, and shortly thereafter was put on deep nights. *Id.*

Although the "reason" for the move was due to alleged understaffing in patrol, the fact remains that Foutch had never been moved to patrol on the prior occasions that patrol was allegedly understaffed.

Due to the intense retaliation that was occurring, the TMPA sent a letter dated March 23, 2015, from TMPA Staff Counsel Chad R. Hyde to Walthall. *See p. 9, supra.* In that letter, the TMPA challenged Walthall's attempts to prevent the formation of the CPOA. Specifically, the TMPA wrote:

> It is my understanding that you have met individually with officers and questioned their reasons for joining an association. I further understand that officer were informed that they 'do not need an association.' Officers that are leading the efforts have also been subjected to unlawful intimidation and reprisal due to their association involvement, and in the case of one officer, coercive questioning about association business by one of your Sergeants.

Despite the fact that Walthall was quick to escalate complaints about Mote into an internal affairs investigation, Walthall took no actions pursuant to General Order 300 (titled ""Discipline/Complaints Against Police Personnel")[2] with respect to this complaint that was clearly filed against her command staff through the above letter. Thus, Walthall was plainly condoning and participating in the retaliation that was going on.

Even after the TMPA letter, the harassment continued against Mote. Once again, Tyson and West were at the forefront of making a mountain out of a molehill by giving Mote a Performance File Documentation on a minor issue. *See p. 10, supra.*

Walthall's actions in connection with the Driver license checks also show the blatant retaliatory behavior against Mote. Before the complaint is officially received and prior to the internal affairs investigation is commenced, Walthall informed Mote that he is guilty of wrongful

---

[2] *Walthall Depo. 120, Ex. 45.*

usage of the TLETS system regarding running driver licenses, he could face criminal charges, she knows he disseminated the information, and he is guilty of these actions. *See p. 12, supra.* Walthall also told Mote that was being permanently removed as SRO and assigned to patrol and can expect to at least receive days off for the incident. *Id.* Further irregularities included the delay in giving Mote the official letter of complaint, which eventually resulted in four pages of frivolous incidents. *Id.* The updated complaint for IA #2015-001 alleging that Mote used his work laptop for personal use was equally without merit as described on page 13, *supra.*

The harassment of Mote continued when Walthall accused Mote of speaking to Foutch about the internal affairs investigation even though Foutch was a Corporal within his chain of command. *See p. 14, supra.* That same day, Walthall falsely accused Mote of violating the rules on working off duty. *See pp. 14-15, supra.* Without even opening a new investigation or submitting a new complaint, Walthall simply removed Mote from patrol, placed him on admin duty, and banned him from working off duty, which cost Mote extra wages. *Id.* These are all additional adverse actions that Defendant does not address in her grounds for motion for summary judgment.

Even on the actual grounds for Walthall's motion for summary judgment concerning Mote's termination for the juvenile incident, there is more than enough summary judgment evidence of retaliatory animus. First and foremost, Mote's supervisor's actions at the time of the incident show that he believed it was reasonable for Mote to leave the scene where the homeowner actually opens the door, lets the girls in the house, Mote tells him that he just wanted to make sure the girls got in safe, the homeowner says okay and thanks, and he then closes the door. *See pp. 15-16.*

Second, the instantaneous and continual harassment and retaliation that Mote suffered from the time he went public about his plans to form an association constitute compelling evidence of

animus. Temporal proximity combined with other indications of retaliatory animus raise sufficient evidence of a causal link between the protected activity and the adverse action. *See, e.g., Holland v. Shinseki*, 2012 U.S. Dist. LEXIS 6788, *55 (N.D. Tex. Jan. 18, 2012) (denying summary judgment based on employee not having an AWOL designation removed from her records unlike other employees, and the temporal proximity of the protected activity and adverse actions six to nine months later); *Trevino v. UPS*, 2009 U.S. Dist. LEXIS 98738 (N.D. Tex. October 23, 2009) (denying summary judgment on grounds termination followed several weeks after the protected activity, along with evidence of an earlier remark by supervisor about employee having run out of FMLA leave); *Villalon v. Del Mar College Dist.*, 2010 U.S. Dist. LEXIS 82766,*19-21 (S.D. Tex. August 13, 2010) (temporal proximity of four months between leave and termination, along with supervisor's negative reaction to use of leave, raises genuine issues of material fact regarding retaliation); *Hayden v. Garden Ridge Management*, LLC., U.S. Dist. LEXIS 119726 (E.D. Tex. December 22, 2009) (temporal proximity of less than two weeks between request for leave and termination in addition to evidence of negativity by management to request sufficient to raise genuine issues of material fact regarding retaliation).

The evidence in this case is even more compelling than the evidence in the above-referenced cases. From the start, Walthall and her leadership team expressed severe negativity toward Mote for leading the charge to form an association. Walthall made it clear to her leadership team that the association would lead to bad things, and her leadership team acted on her directives.

Defendant attempts to lessen the retaliatory motives of the Chief's actions by pointing out that Lt. Gregg did the internal affairs investigation, and that Lt. West and Assistant Chief McElligot reviewed the results of the investigation and recommended that Mote be terminated. *See D's motion, p. 12.* There is, however, a huge whole in that argument. All three of those persons showed

their negativity toward the association in varying ways. Both Gregg and West were recipients of Walthall's e-mail regarding the negative TMPA article from the Edinburg police department. Gregg had previously expressed negative feelings about the association, warned Mote about starting the association, and that if it did not go well, things could get ugly. West was an ongoing participant in the retaliatory actions against Mote along with Tyson. McElligot, was one of the first leaders that sat Mote down and told him what a bad idea it was to start an association, expressed his negativity about having an association, and told Mote that it was simply not needed.  From the foregoing, the independence of both the investigation and recommendations from Gregg, West, and McElligot is a highly disputed issue of fact.

Yet another factor that supports summary judgment being denied is the vast difference between Mote's termination and other similarly-situated officers either not getting disciplined for more egregious acts, or getting discipline short of termination for more egregious acts. Mote was disciplined with days off without pay for two auto incidents, but Lt. West and Officer Fraga were only given verbal and written warnings for similar vehicle incidents/damage. *Pl's Ans. To D's First Set Int., No. 11*. Officer Kirkwood was ten given days off without pay for public drunkenness and pushing an Arlington police officer but Officer Mote was terminated for doing nothing wrong, and at worst, a minor infraction.3 *Pl's Ans. To D's First Set Int., No. 11*; *Mote Depo. 159:10-165:10.* Corporal Thompson was given days off without pay for failing to make entry of a door and render aid after an assault was witnessed, but Officer Mote was terminated for doing nothing wrong, and at worst, a minor infraction. *Id.* Sgt. Brock was given a written warning for dereliction of duty and falsifying a government document, yet Officer Mote was terminated for doing nothing wrong, and at worst, a minor infraction. *Id.* Mote did the same thing that Shane Rodgers did while

---

3 In Kirkwood, at least one of the supervisors who was asked to make a recommendation as to punishment had recommended termination, something that Walthall considered and dismissed. *Walthall Depo. 108-09.*

he was an SRO, and Mote was disciplined and removed from his position as a SRO, and Rodgers received a mere warning. *Pl's Ans. To D's First Set Int., No. 11.* Rachel Roberts had an incident with juveniles on private property virtually the same as the incident involving Mote, and she was neither terminated nor given any discipline whatsoever. *Id; Roberts Depo. 8-9, 45-48.*

On pages 20-22 of her motion, Walthall argues that some of the comparators Mote uses are "not similarly situated." The law, however, favors Mote on this issue. On much lesser facts than Mote's facts in this case, the Fifth Circuit has ruled that a plaintiff had met his burden of showing "similarly situated" or "nearly identical." In *Smith v. City of St. Martinville,* 575 Fed. Appx. 435, 440 (5th Cir. 2014), the Fifth Circuit ruled that there was sufficient summary judgment evidence to support the plaintiff's (the assistant police chief) allegation that two police dispatchers and a school-crossing guard, who all had vastly different job duties within the police department than the plaintiff assistant police chief, were "similarly situated employees" who were treated more favorably than the plaintiff "under nearly identical circumstances." In making this determination, the Fifth Circuit specifically distinguished the seminal case on nearly identical, *Lee v. Kansas City Ry. Co., 574 F.3d 253, 259-60.* The court in Smith made the following comments about *Lee*:

> Compare, e.g., *Lee*, 574 F.3d at 259-60 ("Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated. Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated."), *with, e.g., Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 382-83 (7th Cir. 2000) ("[I]n determining whether employees are similarly situated, the inquiry varies depending upon the type of employer conduct at issue. . . . Here, the uncontradicted testimony was that the policy at issue was applied to all employees regardless of job description. . . . Nothing in the policy rendered [the employer's proffered] distinction [among employees] meaningful. . . . [T]he court erred in concluding that the proposed [comparator employees] were not similarly situated[.]"). On these facts, we conclude that

there is a genuine issue of fact as to whether Thierry, Roy, and
Resweber were similarly situated.
*Smith at 440.*

Based upon all of the foregoing facts and authority, Defendant has not come forward with

sufficient proof that it is entitled to summary judgment on Mote's first amendment association

claims. As such, the court should deny Defendant's motion for summary judgment.

**D.     The Summary Judgment Evidence Establishes a Genuine Issue of Material Fact
Regarding Mote's First Amendment Speech Claims**

**1.     Mote's Speech is a Matter of Public Concern**

On pages 14-17 of her motion, Walthall argues that she is entitled to summary judgment

on Mote's first amendment free speech claims because Mote's speech was not a matter of public

concern. As will be shown below, this is simply not the case.

Walthall focuses in on Mote's and the association's goals as being on internal

administration matters only. But it is simply incorrect when she argues that, in every instance, an

internal grievance about police administration is not protected speech. *See Givhan v. Western Line

Consol. School Dist.*, 439 U.S. 410, 413, 99 S.Ct. 693, 695 (1979) (Rehnquist, J.) (private, internal

speech complaining about "employment policies and practices at [the] school which [petitioner]

conceived to be racially discriminatory" was protected). After all, an employee's speech can

contain a mixture of public and personal concerns and still be protected. *See, e.g., Gonzalez v.

Benevides*, 774 F.2d 1295, 1298 (5th Cir. 1985), cert. denied, 475 U.S. 1140 (1986) ("We do not

read *Connick* [*v. Myers*, 461 U.S. 138 (1983)] to exclude the possibility that an issue of private

concern to the employee may also be an issue of public concern.")

In *Thompson v. City of Starkville*, 901 .2D 466 (5th Cir. 1990) the plaintiff complained, in

writing at first and orally later, about being passed over for promotion and his "frustration with not

having been allowed to sit [for] the sergeant's exam ... and with the ratings he received." 901 F.2d

at 466. But the Fifth Circuit recognized that Thompson's speech went beyond his own personal concerns. *Id.* His complaints dovetailed with other problems within the department that affected his co-workers and the public at large: widespread misbehavior in the department, political favoritism guiding promotions rather than merit, and racial discrimination against others. *Id.* at 465-466. Thompson also helped other officers who had grievances. *Id.* at 466. Clearly, he spoke out of more than just base self-interest.

Walthall ignores the possibility of speech with a mix of both public and private concerns where all or some of the speech is protected. *Davis v. McKinney*, 518 F.3d 304, 307, 315-316 (5th Cir. 2008) (plaintiff was an "IS Audit Manager" that engaged in both citizen speech within the college, but outside her chain of command, and employee speech within her chain of command complaining about discrimination in an audit she was required to conduct); *Freitag v. Ayers*, 468 F.3d 528, 544-545 (9th Cir. 2006) (when a state corrections officer tasked with disciplining inmates complained within her chain of command about inmate misconduct it was not public speech, but reports about the same problem to state officials outside her chain of command were protected).

The association's goals were listed in a document entitled "Goals of the Corinth Police Officers Association." *Mote Depo. 125-26, Ex. 15.* These goals were wide-ranging, including issues regarding pay and certain benefits of police officers, establishing a chaplain program to support officers as well as officers' families, and establish an officer assistance/benevolent program in conjunction with area churches and non-profit organizations. *Id.* In fact, an entirely separate sheet in the goals was devoted to student safety and other issues for the schools within the departmental authority. *Id.* These goals clearly show that Mote's speech went beyond just internal police administration matters, and into matters involving the city as a whole. This mixture of speech is more than sufficient to give Mote protection under the free speech aspect of the first

amendment.

**E.     The Summary Judgment Evidence Establishes a Genuine Issue of Material Fact Regarding Mote's Equal Protection Claims**

**1.     Is There a Misunderstanding of Plaintiff's Equal Protection Claim?**

On pages 18-22 of her motion for summary judgment, Walthall asserts that Officer Mote's equal protection cause of action under 42 U.S.C. §1983 should be dismissed. Defendant's analysis of the law, however, does not make sense in connection with Mote's equal protection claims in this case. Later on in its motion, Defendant accurately describes Mote's equal protection cause of action under 42 U.S.C. § 1983 on pages 23-25 of its motion.

**2.     Mote Has Shown Sufficient Summary Judgment Evidence to Create a Genuine Issue of Fact Concerning His §1983 Equal Protection Claim.**

Officer Mote initially agrees with Defendant with respect to her assertion that §1983 claims against Walthall in her official capacity are essentially treated as claims against the City of Corinth. *See Bellard v. Gautreaux,* 675 F.3d 454, 462 (5th Cir. 2012). In connection with a claim against a municipality under §1983, a municipality may be held liable for the deprivation of rights guaranteed by the Constitution or federal law only if the deprivation was the result of an official policy, which may be represented either by a policy or custom. *See Monell v. Social Services*, 436 U.S. at 693. The plaintiff must show that: (1) the municipality had a policy or custom, of which (2) a municipal policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation was the moving force behind the policy or custom. *See World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 752-53 (5th Cir. 2009).

It is, however, important to note that a plaintiff may successfully allege in a §1983 claim that the policy or custom can be unwritten. Where an unwritten policy or custom is at issue, the plaintiff must demonstrate that the practice is so "persistent and widespread" as to constitute "permanent and well settled" policy. *Monell*, 436 U.S. at 691. An isolated incident is typically not

enough. *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002). Instead, a plaintiff must demonstrate a pattern of wrongs that are both sufficiently numerous and sufficiently similar and specific to the one that caused the plaintiff's injuries. *See Estate of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 383 (5th Cir. 2005);  Piotrowski v. City of Houston*, 237 F.3d 567, 581-82 (5th Cir. 2001); *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989).

Mote has previously shown in this brief that he was subjected to multiple incidents of retaliation, including performance file issues, an involuntary transfer from a SRO to deep nights patrol, written reprimand, being taken off patrol, prohibited from taking off duty work, and termination after it became known that he was leading the charge to form a union or association. In addition to those multiple incidents, Walthall also retaliated against another main proponent of joining the union or association, when she transferred Jason Foutch from the criminal investigations division to a deep nights shift in patrol. That is more than sufficient to establish a "pattern of wrongs that are both sufficiently numerous and sufficiently similar and specific to the one that caused the plaintiff's injuries." *Estate of Davis* at 383. As such, Mote has satisfied his burden of demonstrating a genuine issue of fact for trial.

On page 24 of her motion and brief, Walthall argues that she was not the final policymaker, and that fact defeats Mote's §1983 claims. That law, however, only applies where there is an allegation that there was a "single decision." A "single decision" by a policymaker may constitute official policy, but only in the "extremely narrow" circumstance in which the decision maker is also a "final policymaker." *Bolton v. City of Dallas,* 541 F.3d 545, 548 (5th Cir. 2008) (citing *Woodard v. Andrus*, 419 F.3d 348, 352 (5th Cir. 2005)). Since Mote has alleged multiple incidents and not merely a "single decision," the arguments concerning "final policymaking authority are completely moot. This is especially true where Mote's discharge was upheld by the City Manager

after Mote appealed the Chief's decision to terminate him. Thus, summary judgment should be denied on Mote's equal protection claim.

## F.   Mote's Texas Labor Code §101.301 Claims Should Not Be Dismissed

### 1.   Walthall's Governmental Immunity Defense is Not Valid.

On pages 25-26 of Walthall's motion and brief, she asserts that Officer Mote's Texas Labor Code §101.301 claims against Walthall in her individual capacity should be dismissed based on the doctrine of governmental immunity. Defendant is simply wrong for the simple reason that the doctrine of sovereign immunity applies only to governmental entities, not individual persons. Mote's lawsuit was filed against Walthall, not the City of Corinth. Since Mote sued Walthall in her individual capacity, there is no sovereign immunity.

Defendant asserts that the Texas Tort Claims Act election of remedies provisions requires a dismissal of Mote's state law claims. In reliance on that assertion, Defendant cites a provision of the statute that states "[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code §101.106(e).

Defendant's argument based on the Tort Claims Act is wrong for a very simple reason. Mote never named the City of Corinth as a defendant in this case. Mote's lawsuit has always been against only Walthall. Thus, the suit was never "filed under this chapter against both a government unit and any of its employees," but rather just against one of its employees. Since the "governmental unit" has not been sued in this case, Walthall cannot be dismissed under Tex. Civ. Prac. & Rem. Code §101.106(e).

Additionally, Mote has not asserted any tort claims under Texas common law. All of Officer Mote's causes of action are based on constitutional and statutory causes of action. At no

time has Mote ever alleged any remedies or claims based on the Texas Tort Claims Act. Accordingly, Walthall's governmental immunity defense is not valid with respect to Mote's claims pursuant to Texas Labor Code §101.301.

> **2.** **There is More Than Sufficient Summary Judgment Evidence to Create a Genuine Issue of Fact Regarding Defendant's Violation of Texas Labor Code §101.301.**

Texas Labor Code Section 101.301 states as follows:

> (**a**) The right of a person to work may not be denied or abridged because of membership or nonmembership in a labor union or other labor organization.
> (**b**) In the exercise of the right to work, each person shall be free from threats, force, intimidation, or coercion.
> (**c**) A person who violates this subchapter is liable to a person who suffers from that violation for all resulting damages.

On pages 26-27, Defendant summarily argues that Walthall was limited in her dealings with Mote, and that there is no evidence of wrongdoing. This "summation" ignores the overwhelming evidence of Walthall's overriding hostility to the formation of the labor organization, her extreme efforts to quash it by retaliating against Mote and other leaders of the association, her tolerance of the negative and hostile acts of her subordinates, and the punitive actions she took against Mote, all of which have been previously addressed. *See pp. 2-17, supra.*

Accordingly, Defendant's motion for summary judgment on Mote's Texas Labor Code claims should be denied.

## G.   Plaintiff is Voluntarily Dismissing His Texas Government Code §614.021 et seq. Claims

In light of the recent Texas Supreme Court case, *Colorado County v. Staff, 2017 WL 461363, at *1, 11 (Tex. Feb. 3, 2017),* Mote has agreed to voluntarily dismiss his Texas Government Code §614.021 *et seq.* claims.

H.      **Plaintiff's Declaratory Judgment and Injunctive Relief**
        **Claims Should Not be Dismissed**

1.      **Mote's Declaratory Relief Claims are Valid.**

On pages 28-29 of her motion, Defendant devotes a short paragraph to her argument that Mote's claims for declaratory judgment should be dismissed because all of his underlying constitutional and statutory claims should be dismissed. Mote, however, has easily shown that there are genuine issues of fact with respect to his constitutional and statutory claims. As such, his request for declaratory relief should likewise not be disturbed.

2.      **Officer Mote's Injunction Requests Are Essential**
        **Remedies And Should Not Be Dismissed.**

On pages 29-30 of Walthall's motion and brief, she argues that Officer Mote's requests for injunctive relief should be dismissed. There are two bases for her argument: (1) Mote does not have a viable underlying legal claim, and (2) Mote has an adequate remedy at law for money damages from the City. Neither of these contentions hold any water.

The first basis of Walthall's attempt to dismiss Mote's injunctive relief claims is easily put to rest. As shown throughout this response and brief, Mote indeed has many viable legal claims against Walthall. These constitutional and statutory causes of action are all supported by sufficient summary judgment evidence and applicable law.

The second basis of Defendant's attempt to dismiss Mote's injunctive relief claims is equally unconvincing. Although it is true that Mote has requested money damages in this lawsuit, money damages is not the only remedy for Defendant's actions. For example, Mote has specifically requested reinstatement to his prior position, a remedy that is not contemplated in a damages remedy. Additionally, as Defendant has argued in her very motion and brief, Defendant is relying upon sovereign immunity on a number of Mote's causes of action, which, if successfully

argued by Defendant, would prohibit an award of damages. Thus, the only other relief that would be available in that case would be injunctive relief.  Case law clearly supports this conclusion.

A plaintiff may seek declaratory or injunctive relief based on violations of constitutional or statutory law, and sovereign immunity does not protect governmental entities from such suits *Patel v. Tex. Dep't of Licensing & Regulation,* 469 S.W.3d 69, 75–77 (Tex. 2015) (constitutional law); *City of El Paso v. Heinrich,* 284 S.W.3d 366, 371–377 (Tex. 2009) (statutory law); *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 149 (Tex. 1995) (constitutional law). This is true even if an incidental effect of the equitable relief is that the governmental entity will be required to pay money to the plaintiff. *City of El Paso v. Heinrich,* 284 S.W.3d 366, 369–372 (Tex. 2009) (suit to require officials to comply with statutory or constitutional law not prohibited by immunity even if prospective relief to that effect compels payment of money).

In a suit seeking prospective relief designed to secure compliance with existing statutory or constitutional law, the proper defendants are the public officials alleged to have violated the law, not the governmental entity served by those officials. *City of El Paso v. Heinrich,* 284 S.W.3d 366, 372–373 (Tex. 2009) (suit that seeks to compel compliance with statutory or constitutional law must be brought against governmental actors in official capacity, not against governmental entity itself, which retains immunity); see *Lowell v. City of Baytown,* 356 S.W.3d 499, 502 (Tex. 2011) (per curiam) (firefighters' suit seeking prospective compliance with pay statute had to be brought against appropriate officials, not against city itself).

Based upon the foregoing authority, Defendant's motion for summary judgment on Mote's request for injunctive relief should be denied.

## I.     There is a Genuine Issue of Fact Concerning Defendant's Qualified Immunity Defense

On pages 30-34 of her motion and brief, Defendant attempts to convince this court that she

has met her burden of proving her affirmative defense of qualified immunity. It is important to note, however, that Defendant did not move for summary judgment on its qualified immunity defense of Mote's first amendment *association* claims, but only on his first amendment *speech* claims. Thus, the court cannot consider Defendant's qualified immunity defense on Mote's first amendment *association* claims. As such, Plaintiff is addressing only his free speech claims on the issue of qualified immunity.

Another important point that Defendant left out of its brief is the limited nature of what the court may consider on a motion for summary judgment with respect to a qualified immunity defense. Plaintiff will address that gap in Defendant's motion and brief here.

Once a defendant invokes his entitlement to qualified immunity, "the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002).* This burden applies both at trial and on summary judgment. *Id.*; see also *Bazan ex rel. Bazan v. Hidalgo Cnty., 246 F.3d 481, 489 (5th Cir. 2001).* The plaintiff must rebut the defense by establishing that the allegedly wrongful conduct violated clearly established law. See *Michalik v. Hermann, 422 F.3d 252, 262 (5th Cir. 2005).*

The qualified immunity defense is appropriately resolved at the summary judgment stage when (1) a plaintiff has established that the defendant has engaged in the complained-of conduct or (2) the court "skip[s], for the moment, over ... still-contested matters to consider an issue that would moot their effect if proved." *Harlow, 457 U.S. at 818; see also Haverda v. Hays Cnty., 723 F.3d 586, 599 (5th Cir. 2013).* "'If resolution of [qualified immunity] in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability ..., and if there are conflicting versions of his conduct, one of which would establish and the other defeat liability, then the case is inappropriate for summary

judgment.'" Haverda, 723 F.3d at 599 (quoting *Barker v. Norman, 651 F.2d 1107, 1123-24 (5th Cir. Unit A July 1981)).* Although summary judgment may be appropriate based on a plaintiff's inability to prove the facts essential to recovery, this "has nothing to do with the qualified immunity defense." Id.

Based on the foregoing law, the only consideration that should be made on the qualified immunity defense in this case is whether Mote's free speech activities were protected under the first amendment. Judge Barbara Lynn addressed the proper procedure in *Kostic v. Texas A&M Univ. at Commerce, 11 F.Supp.3d 699, 715-16 (N.D. Tex. 2014):*

> in addressing the first step of the analysis of the Individual Defendants' *qualified immunity defense*, consideration of the adverse employment action and causation elements are inappropriate for *summary judgment*, because, even if Plaintiff cannot establish a genuine issue of material fact as to these elements, this "has nothing to do with the *qualified immunity defense*." *Haverda, 723 F.3d at 599.*
>
> The Court should, however, resolve on *summary judgment* whether, as a matter of law, Plaintiff's *Section 1983* retaliation claim alleges a violation of his *First Amendment* rights based on the first three elements of such a claim laid out above, or, put another way, whether Plaintiff's speech was protected under the *First Amendment. See Petrie, 2013 U.S. App. LEXIS 22221, 2013 WL 5835612, at *1-*2 (5th Cir. 2013).*
> *Kostic at 715-16.*

Based upon the foregoing authority, the only thing to decide on a motion for summary judgment on a qualified immunity defense is whether Mote's speech was protected under the first amendment. As such, Walthall's arguments concerning whether her actions were objectively reasonable on pages 33-34 of her motion and brief should be disregarded.[4]

---

[4] Even if those arguments were available to Defendant on a motion for summary judgment, the fact remains that there is overwhelming evidence of retaliation and improper motive in this case as described on pages 2-17, *supra.* Furthermore, Plaintiff's expert witnesses, Mote and Foutch, submitted their expert opinions that plaintiff acted reasonably with respect to the police call/incident at issue in this case, and that his termination was not appropriate and objectively unreasonable. *See Plaintiff's Designation of Rebuttal Experts.* This evidence directly contradicts Defendant's expert's opinion.

There can be no doubt that a public employee's right to free speech is a protected right under the first amendment. *See cases cited on pages 30-32, supra.* There is also a genuine issue of fact as to whether Mote's speech, although mixed between internal and public matters, involved a matter of public concern. *Id.* Accordingly, Defendant's motion related to her qualified immunity defense on Mote's free speech claims should be denied.

## IV. CONCLUSION

For all of the foregoing reasons, this court should deny Defendant's motion for summary judgment in its entirety.

Respectfully submitted,

**LYON, GORSKY & GILBERT, L.L.P.**
12001 N. Central Expressway
Suite 650
Dallas, Texas 75243
Phone: (214) 965-0090
Fax:    (214) 965-0097

By:/s/ *David K. Watsky*
David K. Watsky
State Bar Number 20932600
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2017, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to all counsel.

/s/ *David K. Watsky*
David K. Watsky