# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| MARCUS MOTE | § | |
| | § | |
| v. | § | Civil Action No.  4:16-CV-00203 |
| | § | Judge Mazzant |
| DEBRA WALTHALL | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment (Dkt. #55). Having considered the pleadings, the Court finds the motion should be granted in part and denied in part.  Defendant's motion for summary judgment is granted as to Plaintiff's equal protection claim and Texas Government Code § 614.021 claim.  Defendant's motion for summary judgment is denied as to all other claims.

## BACKGROUND

Plaintiff Marcus Mote worked as a police officer for the City of Corinth, Texas (the "City") from December 14, 2009, to October 20, 2015.  Plaintiff was a member of the Texas Municipal Police Association, a labor association of law enforcement personnel.  Plaintiff alleges Defendant Debra Walthall, the Chief of Police, terminated him for his involvement with the Corinth Police Officers' Association ("CPOA"), a local chapter of the Texas Municipal Police Association. Plaintiff brings claims against Defendant for alleged violations of the First and Fourteenth Amendments under 42 U.S.C  § 1983 ("Section 1983") and alleged violations of the Texas Labor Code § 101.301.[1]

During his time as a police officer, Plaintiff was the subject of twelve disciplinary matters,

---

[1] Plaintiff's Response to Defendant's Motion for Summary Judgment indicates that Plaintiff is no longer pursuing claims under Texas Government Code § 614.021 (Dkt. #63 at p. 35).  The Court will therefore dismiss these claims.

including his termination (Dkt. #55, Exhibit 5). Nine of these disciplinary matters occurred from September 2010 to July 2014, before Plaintiff formed CPOA. Three disciplinary matters occurred after Plaintiff formed CPOA. In January 2015, Plaintiff and Corporal Jason Foutch ("Foutch") informed Defendant of their intent to form CPOA. Defendant expressed her support for the association. Plaintiff alleges that between January 28, 2015 and January 30, 2015, Lieutenant Frank McElligott ("McElligott"), Internal Affairs Lieutenant Jimmie Gregg ("Gregg"), and Sergeants Clint Ventrca ("Ventrca"), Kevin Tyson ("Tyson"), and Joe Wheat ("Wheat") expressed negativity regarding CPOA. Plaintiff alleges these individuals attempted to persuade Plaintiff not to form CPOA. Plaintiff alleges that on January 30, 2015, Tyson "verbally yelled at [Plaintiff] for 45 minutes regarding [Plaintiff's] involvement with the association." Plaintiff states Gregg and Wheat participated in the conversation and voiced their negativity about the association.

On February 4, 2015, Plaintiff and Defendant met again regarding CPOA. Plaintiff alleges that Defendant reluctantly stated she would support CPOA as long as the association maintained a positive message. Plaintiff alleges that Defendant told him that "things [would] get ugly" if the association turned negative (Dkt. #63 at p. 5). Plaintiff alleges Defendant agreed to issue a statement clarifying her support for the association, but did not do so (Dkt. #63 at p. 5). On February 11, 2015, Plaintiff led a meeting to organize CPOA. Plaintiff, Foutch, McElligott, Ventrca, Wheat, Corporal Ryan Brock, and Officers Jessie Gonzalez ("Gonzalez"), Michael Fraga, Carson Crow, and Lee Thompson attended the meeting.

On February 13, 2015, Defendant emailed Assistant Chief Greg Wilkerson ("Wilkerson"), Lieutenant Carrie West ("West"), and Gregg an article regarding a Texas Municipal Police Association in Edinburg, Texas. The article discussed a Texas Municipal Police Association management survey that was critical of the Edinburg police department administration.

Defendant's email stated, "[c]heck the article on Edinburg PD. This is exactly what TMPA will lead our guys to. This is the same survey that they did years ago on Allen PD." (Dkt. #1 at p. 2). Plaintiff alleges that Defendant worked for the Allen Police Department when the Allen City Council received a similar Texas Municipal Police Association management survey critical of police administration.

Plaintiff alleges that shortly after the initial CPOA meeting, he was cited for a number of disciplinary issues. On March 4, 2015, Plaintiff received a "performance file issue regarding the cleanliness of his assigned patrol unit." (Dkt. #1 at p. 3); (Dkt. #55, Exhibit 5). On March 14, 2015, Tyson inspected Plaintiff's patrol car (Dkt. #63 at p. 8). On March 18, 2015, West reprimanded Plaintiff for not conducting a full inspection of his patrol car and documenting it on the patrol sheet (Dkt. #63 at p. 8). On April 8, 2015, West and Tyson issued Plaintiff a performance file issue stating that he failed to notify communications that he was working an off-duty assignment (Dkt. #63 at p. 10; Dkt. 55, Exhibit 5). Plaintiff states that at the time he did not have a patrol car assigned to him and forgot to check on duty with his police radio (Dkt. #63 at p. 10).

During his time as an officer, Plaintiff served as a School Resource Officer for Lake Dallas High School ("LDHS"). On May 7, 2015, the assistant principal of LDHS asked Plaintiff to conduct screening of prom guests who were not LDHS students. Plaintiff states that the assistant principal and Officer Shane Rodgers ("Rodgers"), the previous School Resource Officer at LDHS, told Plaintiff to review the driver's license records of the guests. Plaintiff used the Texas Law Enforcement Telecommunication System ("TLETS") database to review the driver's licenses of approximately forty guests. Plaintiff did not obtain permission from a supervisor to use the TLETS database to review the driver's license records.

Plaintiff then informed the assistant principal that one of the guests had an arrest record

3

and recommended that the assistant principal inform the principal of the arrest. The principal chose not to allow the individual to attend the prom, and the student's parent and the guest's parent complained to the principal. On May 8, 2015, Plaintiff told Gregg about the situation and the parents' complaint. Plaintiff states that although Gregg initially told Plaintiff this was not a problem, Gregg later called Plaintiff and told him he was not sure whether Plaintiff should run driver's licenses for this purpose (Dkt. #63 at p. 11). On May 11, 2015, West met with the principal regarding the situation. West told Plaintiff to leave the school and return to the police department. Upon arrival at the police department, Defendant told Plaintiff that he wrongfully used the TLETS database for non-law enforcement purposes and would be permanently removed as a School Resource Officer. That same day, McElligott issued an administrative warning to both Plaintiff and Rodgers.

On May 14, 2015, McElligott received authorization from Defendant to initiate an internal affairs investigation into the allegations of misconduct by Plaintiff and Rodgers. On June 10, 2015, Plaintiff receive a letter of complaint regarding the allegations of misconduct. On July 2, 2015, McElligott sent Defendant a "Conclusion of Investigation" memo (Dkt. #55, Exhibit 6).

The memo states that "the allegations of violations of policies of the Corinth Police Department, the Texas Department of Public Safety, and TLETS Operating Manual" were found to be true (Dkt. #55, Exhibit 6). The memo states that the "Department of Public Safety holds information derived from the TLETS network, such as driver's license data and vehicle registration data, in the same regard as CJI (Criminal Justice Information) and requires agencies to afford it the same level of protection as required for CJI." The TLETS Operating Manual likewise reminds users that "driver's license information obtained from these files are to be used for criminal justice and law enforcement purposes only." The memo notes that Plaintiff had taken TLETS training

twice and passed tests after completing the training. Plaintiff also acknowledged that the Texas Department of Public Safety views driver's license history the same way it views criminal history in terms of privacy and acknowledged the school could have received the information from a public domain. The memo also details Plaintiff's use of a department-issued laptop for non-work related purposes. Plaintiff received a written reprimand for the use of the TLETS database and use of the laptop. Rodgers was issued a written warning.

On July 12, 2015, Plaintiff was involved in another incident leading to a second internal affairs investigation. While on patrol at 3:30 a.m., Plaintiff encountered two juveniles in front of a residence in Corinth, Texas. Plaintiff did not exit his patrol car to make contact with the juveniles, but asked from his patrol car what the juveniles were doing and whether they lived at the residence. The juveniles stated they lived at the residence, and walked towards the front door. Plaintiff observed a man open the front door, allow the juveniles to enter, and shut the front door. Plaintiff then drove away.

Within a short time, the homeowner called 911 and stated the juveniles had been drinking and did not live at the location. The homeowner stated that he let the juveniles enter the house because they needed to use the restroom and said the police officer gave them permission to do so. The homeowner also stated that he and his wife work with an organization that assists at-risk youths, and believed the officer had brought the juveniles to their home for assistance. Both juveniles were intoxicated. One juvenile was vomiting, urinated on the homeowner's bathroom floor, and had difficultly standing up. The homeowner stated he did not know why Plaintiff drove away.

Plaintiff returned to the residence after the homeowner called 911. Plaintiff's supervisor, Ventrca, and Gonzalez also responded to the 911-dispatch call. The officers removed the juveniles

from the home and issued citations for consumption of alcohol by a minor. Plaintiff acknowledged that when he returned to the home and exited his vehicle, he could see one juvenile was "visibly intoxicated" and that he "could faintly smell alcohol" on the other's breath. One of the juveniles was transported via ambulance to Denton Regional Medical Center for signs and symptoms of alcohol intoxication.

On July 30, 2015, Gregg received authorization from Defendant to initiate an internal affairs investigation into allegations of misconduct regarding the juveniles' incident. The August 2015 "Summary of Investigation" and "Conclusion of Investigation" memos state Plaintiff admitted his view of the juveniles was limited. Plaintiff admitted that if he had gotten out of his vehicle, he would have known the individuals were juveniles. Plaintiff did not identify the two juveniles, did not walk or escort the juveniles to the front door of the residence, and did not verify that the juveniles lived at the residence. Plaintiff also did not identify the male who opened the front door.

During the investigation, Gonzalez stated that he would have verified if the juveniles lived at the residence, regardless of what they said. Gonzalez likewise stated that through his interactions with the juveniles he could determine they were intoxicated, and pointed out that one of the juveniles had slurred speech and difficulty standing. Ventrca likewise stated that if Plaintiff would have had direct contact with the juveniles, he would have had clear indication the juveniles were intoxicated. Ventrca stated that if Plaintiff had realized the juveniles were intoxicated and had left without acting, "there would have been a clear case of dereliction of duty." Gregg's "Conclusion of Investigation" memo found that Plaintiff violated Corinth Police Department policy, including policies stating that an officer shall not engage in conduct which constitutes a neglect of duty and officers shall investigate incidents that come to their attention to the fullest

extent within their assigned responsibilities. The memo also found that Plaintiff violated the "Corinth Police Department General Order 2600 Juvenile Field Inquiry." This policy requires that "[u]pon observation of a juvenile who is in possible violation of the City of Corinth Curfew Ordinance . . . an officer should . . . request the juvenile's name, age, date of birth, and address . . . determine why the youth is out, where he/she has been and where he/she is going."

On September 10, 2015, West reviewed the internal affairs investigation and sent Defendant a memo recommending Plaintiff's termination (Dkt. #55, Exhibit 6). West's memo noted disciplinary measures issued against Plaintiff beginning in 2010. West also stated that "[d]isciplinary measures for similar infractions by other officers in the past for Failure to Fully Investigate, Neglect of Duty and/or Unprofessional Behavior have ranged from a Demotion (2011 and 2014) to Termination (2011)." On September 23, 2015, McElligott also reviewed the internal affairs investigation and sent Defendant a memo recommending Plaintiff's termination (Dkt. #55, Exhibit 6). McElligott similarly noted Plaintiff's past disciplinary history and disciplinary measures taken for similar infractions by other officers.

On October 5, 2015, Defendant sent Plaintiff a "Notice of Pre-Disciplinary Hearing" stating that the findings of the internal affairs investigation led to a recommendation of Plaintiff's termination (Dkt. #55, Exhibit 6). The notice states that Plaintiff would be permitted to present reasons why he should not be terminated at a hearing on October 8, 2015. Plaintiff did not waive the right to the pre-disciplinary hearing and elected to proceed with the formal disciplinary hearing process (Dkt. #55, Exhibit 6). On October 20, 2015, Defendant terminated Plaintiff. Plaintiff appealed his termination to the Acting City Manager in an evidentiary hearing held on December 23, 2015. The Acting City Manager upheld Plaintiff's termination on December 23, 2015. Defendant's retained expert, Craig Miller ("Miller"), the Chief of Police for the Dallas Independent

School District Police Department, reviewed the internal affairs investigations and opined that Plaintiff acted inappropriately in his handling of the juveniles' incident (Dkt. #55, Exhibit 33). Miller's expert report states that, in his opinion, Defendant's actions "were objectively reasonable and a reasonable police chief would have made the same decision" regarding the termination (Dkt. #55, Exhibit 33).

Plaintiff alleges that other officers involved with CPOA also faced retaliatory demotions. On March 24, 2015, Gonzalez, one of the individuals who attended the initial CPOA meeting, was reassigned from bailiff to patrol officer. On March 30, 2015, Foutch was removed as Senior Criminal Investigator and reassigned to "deep night" patrol shift (Dkt. #55, Exhibit 21). Plaintiff introduced evidence that other officers had the perception that "people that helped start [CPOA] got moved." (Dkt. #63, Exhibit 6). *See also* Dkt. #63, Exhibit 5 (former Corinth Police Department officer stating that "there were a number of things that kept me from not wanting to get involved because I'm . . . appreciative to be in my position. And I noticed that there were a lot of changes going on and I didn't want to change my job."); Dkt. #63, Exhibit 7 (Corinth Police Department officer stating that his relationship with his sergeant changed after he joined CPOA and that the timing of Foutch, Gonzalez, and Plaintiff's transfers was suspicious).

On February 22, 2016, Plaintiff filed his Original Complaint (Dkt. #1). On March 7, 2017, Defendant filed a motion for summary judgment (Dkt. #55). On April 4, 2017, Plaintiff filed a response (Dkt. #63). On April 11, 2017, Defendant filed objections to Plaintiff's summary judgment evidence and reply (Dkt. #66). On April 25, 2017, Plaintiff filed a response to defendant's objections (Dkt. #67).

## LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248–49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor . . . unsworn allegations [nor]

arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Comput. Corp.*, 98 F. App'x 335, 338 (5th Cir. 2004). Rather, the Court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The Court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## ANALYSIS

Plaintiff brings claims against Defendant under Section 1983 for alleged violations of the First and Fourteenth Amendment. Section 1983 provides a cause of action for individuals who have been "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person or entity acting under color of state law. 42 U.S.C. § 1983. Section 1983 does not grant substantive rights, but provides a vehicle for a plaintiff to vindicate rights protected by the United States Constitution and other federal laws. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.*

### First Amendment Retaliation Claim - Freedom of Association

Plaintiff alleges Defendant retaliated against him for exercising his First Amendment right of association (Dkt. #1 at p. 5). A state action "whose purpose is either to intimidate public employees from joining a union . . . or to retaliate against those who do" violates the First Amendment. *Hitt v. Connell*, 301 F.3d 240, 245 (5th Cir. 2002). To prevail on his First Amendment retaliation claim, Plaintiff must show that (1) he suffered an adverse employment action, (2) his interest in "associating" outweighed his employer's interest in efficiency, and (3)

his protected activity was a substantial or motivating factor in the adverse employment action. *Id.*

Defendant argues she is entitled to summary judgment because Plaintiff's association with CPOA does not represent protected activity and, even if it did, Plaintiff cannot establish the protected activity was a motivating factor for the adverse employment action. The Court finds Plaintiff's association with CPOA represents protected activity and Plaintiff has established the activity was a motivating factor in his termination.

*Protected Activity*

Defendant first asserts that Plaintiff's freedom of association claim fails because Plaintiff's association with CPOA does not represent protected activity. Defendant states that Texas law prohibits the City from recognizing CPOA as a bargaining unit and CPOA is thus a "social association" not entitled to protection under the First Amendment.

Tex. Gov't Code § 617.002 states:

a) An official of the state or of a political subdivision of the state may not enter into a collective bargaining contract with a labor organization regarding wages, hours, or conditions of employment of public employees.

b) A contract entered into in violation of Subsection (a) is void.

c) An official of the state or of a political subdivision of the state may not recognize a labor organization as the bargaining agent for a group of public employees.

Tex. Labor Code § 617.004, however, states: "An individual may not be denied public employment because of the individual's membership or nonmembership in a labor organization." "Regardless of the ambiguity in Texas law, Plaintiff . . . possess[es] a First Amendment right to express support for a union." *Simonelli v. Fitzgerald*, No. CIV.A. SA-07-CA-360, 2009 WL 3806489, at *4 (W.D. Tex. Oct. 22, 2009) (*citing Commc'ns Workers of America v. Ector Cty.*

*Hosp. Dist.*, 467 F.3d 427 (5th Cir. 2006); *Prof'l Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cty.*, 730 F.2d 258 (5th Cir. 1984)). Plaintiff's association with CPOA is not "social association" and is entitled to protection under the First Amendment.

*Retaliation Claim*

Defendant next argues Plaintiff cannot show the third factor of a retaliation claim, that his involvement with CPOA was a substantial or motivating factor in his termination. Defendant states she terminated Plaintiff for his failure to properly investigate the juveniles' incident. Plaintiff argues there is an issue of material fact regarding the motivation for his termination because he experienced hostility from command staff regarding CPOA's formation.

In order to establish his protected activity was a motivating factor in his discharge, Plaintiff must at least establish his protected action was one of the reasons for his termination. *Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013). "Close timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a *prima facie* case of retaliation." *Id.* The causal connection prong "may also be satisfied when the plaintiff relies upon a chronology of events from which retaliation may plausibly be inferred." *Id.* The Fifth Circuit has held that "summary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate." *Haverda v. Hays Cty.*, 723 F.3d 586, 595 (5th Cir. 2013). "Courts deciding the causation issue by summary disposition have generally done so only when the employer's reasons have not been controverted." *Id.*

The Fifth Circuit has also made clear that "First Amendment retaliation claims are governed by the *Mt. Healthy* 'mixed-motives' framework, not by the *McDonnell Douglas* pretext analysis." *Gonzales v. Dallas Cty.*, 249 F.3d 406, 412 n. 6 (5th Cir. 2001). In *Mt. Healthy City*

*School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), the Supreme Court held that once an employee has met his burden of showing that his protected conduct was a "substantial factor" or "motivating factor" in the employer's adverse employment action, the district court should determine whether the employer has shown by a preponderance of the evidence that it would have taken the same adverse employment action in the absence of the protected conduct. "If the employer is able to make such a showing, then the protected conduct in question does not amount to a constitutional violation justifying remedial action." *Charles v. Grief*, 522 F.3d 508, 516 n. 28 (5th Cir. 2008). "An employee can, however, refute that showing by presenting evidence that "his employer's ostensible explanation for the discharge is merely pretextual." *Haverda*, 723 F.3d at 592. "[I]f a plaintiff brings forth evidence of pretext, the determination whether the employer's stated reasons are pretextual is a fact issue reserved for the jury." *Id.* at 595-96.

Defendant argues that Plaintiff's involvement with CPOA was not a motivating factor in his termination because Defendant terminated Plaintiff for failing to properly investigate the juveniles' incident (Dkt. #55 at p. 11). Defendant points to the internal investigation that "confirmed a number of significant policy violations." Defendant states that West and McElligott each independently recommended Plaintiff's termination after reviewing the findings of the investigation. Defendant likewise points to Miller's expert report, which states that, in his opinion, Defendant's actions "were objectively reasonable and a reasonable police chief would have made the same decision" regarding the termination (Dkt. #55, Exhibit 33). Defendant further notes that she terminated Plaintiff more than eight months after their last discussion about CPOA.

However, Plaintiff has introduced evidence of a chronology of events from which retaliation may plausibly be inferred. Plaintiff organized the first CPOA meeting in February 2015. In March 2015, Plaintiff received a "performance file issue regarding the cleanliness of his

assigned patrol unit." Tyson, the individual that "verbally yelled" at Plaintiff regarding his involvement with CPOA, again inspected Plaintiff's patrol car in March 2015.  On March 18, 2015, West, one of the individuals that received Defendant's email regarding the negative Texas Municipal Police Association management survey, reprimanded Plaintiff for not conducting a full inspection of his patrol car and documenting it on the patrol sheet (Dkt. #63 at p. 8).  On April 8, 2015, West and Tyson issued Plaintiff a performance file issue stating that he failed to notify communications that he was working an off-duty assignment.  In May 2015, Plaintiff received a written warning for his use of the TLETS database for non-law enforcement purposes.  In July 2015, Defendant authorized Gregg to initiate an internal affairs investigation into allegations of misconduct regarding the juveniles' incident.  Gregg, who had warned Plaintiff against starting CPOA, found the allegations of policy violations to be true.  West, who received Defendant's email regarding the negative Texas Municipal Police Association management survey, reviewed the internal affairs investigation and recommended termination.  McElligott, who also expressed negativity about the association and attempted to persuade Plaintiff not to form CPOA, also reviewed the internal affairs investigation and recommended termination.  Defendant ultimately terminated Plaintiff after warning him things could "get ugly" if CPOA did not remain positive and emailing her command staff the negative Texas Municipal Police Association management survey.

Although the decision to terminate Plaintiff occurred eight months after the protected activity, "the chain of circumstances outlined above . . . began immediately after the [protected activity] and, drawing all inferences in [Plaintiff's] favor, is enough to raise a genuine issue of material fact regarding the causal connection." *Mooney*, 538 F. App'x at 455 (holding that an employer's criticism of an employee's performance immediately after engaging in protected

activity was a causal link in an adverse employment action even though the criticism did not produce any formal discipline and the ultimate adverse action occurred three years later). Plaintiff likewise introduced evidence that Defendant transferred officers involved with CPOA to other shifts or positions and that officers expressed concern about joining CPOA because they did not want membership in CPOA to affect their working conditions.

The Court finds that there is evidence that Plaintiff's union association was a substantial or motivating factor in the decision to terminate Plaintiff.

Once a plaintiff has met his burden of showing that his protected conduct was a motivating factor in the employer's adverse employment action, "the question becomes whether the employer has met its burden to show, by a preponderance of the evidence, that it would have taken the same adverse employment action against the employee even in the absence of the employee's protected conduct." *Mooney*, 538 F. App'x at 455; *Mt. Healthy*, 429 U.S. at 287. "If the employer is able to make such a showing, then the protected conduct in question does not amount to a constitutional violation justifying remedial action." *Id.* The defendant must raise the *Mt. Healthy* defense to the merits of a First Amendment retaliation claim. *See Connelly v. Texas Dep't of Criminal Justice*, 484 F.3d 343, 346 n. 1 (5th Cir. 2007).

Defendant did not raise the *Mt. Healthy* defense in her briefing or argue that it would have terminated Plaintiff even in the absence of his association with CPOA. Defendant applies the *McDonnell Douglas* pretext analysis and argues the juveniles' incident was the "legitimate non-retaliatory reason for Plaintiff's termination." (Dkt. #55 at p. 13). The Fifth Circuit has made clear that "First Amendment retaliation claims are governed by the *Mt. Healthy* 'mixed-motives' framework, not by the *McDonnell Douglas* pretext analysis." *Gonzales*, 249 F.3d at 412 n. 6. Defendant has not met her burden of showing that she would have taken the same adverse

employment action against the employee even in the absence of the employee's protected conduct.

There is thus an issue of fact regarding whether Defendant would have terminated Plaintiff in the absence of his association with CPOA.

## First Amendment Retaliation - Speech Claim

Defendant next argues that she is entitled to summary judgment on Plaintiff's freedom of speech retaliation claim. Plaintiff's speech claim in this case is based on his association with CPOA.

To establish a retaliatory discharge claim under the First Amendment, Plaintiff must prove that: (1) he suffered an adverse employment action, (2) his speech involved a matter of public concern, (3) his interest in commenting on the matter of public concern outweighed the Defendant's interest in promoting efficiency, and (4) his speech was a substantial or motivating factor behind the Defendant's actions. *Mooney*, 538 F. App'x at 453.

Defendant first argues that Plaintiff's speech did not involve a matter of public concern. "Whether an employee's speech addresses a matter of public concern must be determined by the *content, form,* and *context* of a given statement, as revealed by the whole record." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 186 (5th Cir. 2005) (citing *Connick v Myers*, 461 U.S. at 147–48). "When a public employee speaks in his capacity as an employee and addresses personal matters such as personnel and employment disputes, rather than in his capacity as a citizen on a matter of public interest, his speech falls outside the protection of the First Amendment." *Id.* "When the speech in question merely touches on an element of personal concern in the broader context of a matter of public concern, however, a court is not precluded from concluding that an employee's speech as a whole addresses a matter of public concern." *Id.* "Even a mere scintilla of speech regarding a matter of public concern is sufficient to treat the entire communication as

mixed speech." *Gibson v. Kilpatrick*, 838 F.3d 476, 485 (5th Cir. 2016) (citations omitted). "[S]peech in the context of union activity will seldom be personal; most often it will be political speech." *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 750 (5th Cir. 1993).

Plaintiff's support for CPOA involved a matter of public concern. The goals of CPOA included the following personnel matters: presenting to the City Council "the importance and need for proper tenured pay for all officers and supervisors"; lateral pay for newly hired officers; sick leave; take home car policies; vacation plans; and compensation time (Dkt. #55, Exhibit 10). However, the goals of the association also included social and community aspects such as "continuing to build relationships with the community through charitable work," providing a chaplain program to support the community, officers, and their families in a time of need, and an officer assistance program to assist officers through emotional, marriage, and family hardship (Dkt. #55, Exhibit 14 at p. 37). The content and context of Plaintiff's formation and association with CPOA thus included both personal matters and public matters. The form of Plaintiff's formation and association with CPOA also indicates his speech constituted a matter of public concern. Plaintiff registered CPOA as a nonprofit corporation with the Secretary of State of Texas for the "general purposes of promoting benevolent, charitable, educational, civic, and fraternal activities among its members." (Dkt. #55, Exhibit 10). CPOA's public goals further include asserting a "positive influence on the citizens and the community in which [members] serve." (Dkt. #55, Exhibit 10).

Further, as stated above, there is an issue of fact regarding whether Plaintiff's speech was a substantial or motivating factor behind the Defendant's actions. Defendant's motion for summary judgment as to Plaintiff's first amendment speech claim is therefore denied.

## Fourteenth Amendment Equal Protection Claim

Plaintiff alleges Defendant treated him differently than similarly situated police officers (Dkt. #63 at p. 28).[2] The Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). The Supreme Court has recognized an equal protection claim for discrimination against a "class of one." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The purpose of a class-of-one claim is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.* A class-of-one claimant may prevail by showing he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.*

However, in *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 597 (2008), the Supreme Court clarified that a "class of one" claim is not viable in the context of public employment. *See also Integrity Collision Ctr. v. City of Fulshear*, 837 F.3d 581, 586 (5th Cir. 2016) (citing *Engquist* and noting that "class-of-one equal protection claims are inapposite in the context of discretionary public-employment decisions"); *Klingler v. Univ. of S. Mississippi, USM*, 612 F. App'x 222, 232 (5th Cir. 2015) (citing *Engquist* and stating that "class-of-one claims do not apply in the context of public employment"). Plaintiff is a class-of-one claimant alleging he was treated differently from other similarly situated employees. Plaintiff is also a public employee. Plaintiff's equal protection claim thus fails as a matter of law.

---

[2] Plaintiff raises the "similarly situated" argument as part of his First Amendment claim, not as part of his equal protection claim (Dkt. #63 at p. 28). Plaintiff relies on Title VII cases that apply the *McDonnell Douglas* standards and require that an employee demonstrate his employer treated him less favorably than other similarly situated employees. However, as stated above, the *McDonnell Douglas* standards do not apply in First Amendment retaliation claims. The Court will address Plaintiff's "similarly situated" argument as part of his equal protection claim.

## Qualified Immunity

Defendant asserts that she is entitled to qualified immunity on Plaintiff's constitutional claims. The Court finds that Defendant has not met her burden of proving the affirmative defense of qualified immunity at this time.

"Qualified immunity shields a government official from liability based on his performance of discretionary functions." *Haverda v. Hays Cnty.,* 723 F.3d 586, 59 (5th Cir. 2013) (citing *Beltran v. City of El Paso,* 367 F.3d 299, 302–03 (5th Cir. 2004)). To determine whether qualified immunity is appropriate, a court undertakes a two-step analysis. "First, a court evaluates whether, taking the facts in the light most favorable to the plaintiff, the official's conduct violated a constitutional right." *Id.* (citing *Lytle v. Bexar Cnty., Tex.,* 560 F.3d 404, 409–10 (5th Cir. 2009)). "Second, a court must determine whether that constitutional right was clearly established at the time of the conduct." *Id.* "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19 (1982)).

"The qualified immunity defense is appropriately resolved at the summary judgment stage when (1) a plaintiff has established that the defendant has engaged in the complained-of conduct or (2) the court 'skip[s], for the moment, over . . . still-contested matters to consider an issue that would moot their effect if proved.'" *Id.* (quoting *Harlow,* 457 U.S. at 818). "If resolution of [qualified immunity] in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability . . ., and if there are conflicting versions of his conduct, one of which would establish and the other defeat liability, then the case is inappropriate for summary judgment." *Id.* (quoting *Barker v. Norman,* 651 F.2d 1107, 1123–24 (5th Cir. Unit A July 1981)). Although summary judgment may be appropriate

based on a plaintiff's inability to prove the facts essential to recovery, this "has nothing to do with the qualified immunity defense." *Id.*

Because Plaintiff has demonstrated a dispute of material fact with respect to his constitutional claims, the Court "must proceed to the 'clearly established law' prong of the qualified immunity analysis." *Hardesty v. Cochran*, 621 F. App'x 771, 780 (5th Cir. 2015).

The Fifth Circuit has held that it is "clear that the First Amendment protects an employee's right to associate with a union." *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 748 (5th Cir. 1993) (citing *Smith v. Arkansas State Highway Emps.*, 441 U.S. 463, 464–65, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979); *Vicksburg Firefighters v. City of Vicksburg*, 761 F.2d 1036, 1039 (5th Cir. 1985); *Prof'l Assoc'n of Coll. Educators v. El Paso Cty. Cmty. Coll. Dist.*, 730 F.2d 258, 262 (5th Cir. 1984). There is "no doubt that [an employee has] a clearly established constitutional right not to be fired for engaging in protected speech." *Haverda*, 723 F.3d at 599 (citing *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008) ("Terminating an employee for engaging in protected speech . . . is an objectively unreasonable violation of such an employee's First Amendment rights.")). *See also Liberty Cty. Officers Ass'n v. Stewart*, 903 F. Supp. 1046, 1054 (E.D. Tex. 1995) (holding that under the Texas Labor Code, "Plaintiffs had a clearly established and well known right to participate in, and promote the organization of employees into a labor union . . . Plaintiffs also had a First Amendment right to associate with labor organizations and to speak with other employees to promote organized labor.").

Here, Defendant argues that her reasons for terminating Plaintiff were objectively reasonable because she terminated Plaintiff for the juveniles' incident and sustained complaints of policy violations, not for his association with CPOA. However, "when an official's intent or the reasons for his or her actions are an essential element of the underlying violation, [the Fifth Circuit

has] treated factual disputes over intent just like any other factual dispute that can justify a denial of qualified immunity." *Kinney v. Weaver*, 367 F.3d 337, 373 (5th Cir. 2004) (citing *Tompkins v. Vickers*, 26 F.3d 603, 607–10 (5th Cir. 1994) (holding that a "public official's motive or intent must be considered in the qualified immunity analysis where unlawful motivation or intent is a critical element of the alleged constitutional violation.")) *See also Phillips v. City of Victoria*, 243 F. App'x 867, 871 (5th Cir. 2007) ("when reviewing the objective reasonableness of an official's conduct, we do not disregard the district court's conclusion that a genuine issue of fact exists regarding the official's intent"); *Liberty Cty. Officers Ass'n v. Stewart*, 903 F. Supp. 1046, 1054 (E.D. Tex. 1995) (holding that fact issue regarding whether poor performance was merely a pretext for termination grounded on Plaintiffs' pro-union activities precluded application of qualified immunity defense); *Wyman v. City of Dallas*, No. CIV.A.3:02-CV-2496-D, 2004 WL 2100257, at *11 (N.D. Tex. Sept. 21, 2004) (holding that fact issue regarding an employer's intent in a First Amendment claim precluded summary judgment on the basis of qualified immunity).

There is an issue of material fact regarding whether Plaintiff's association with CPOA was a motivating factor in his termination and thus whether Defendant's actions were objectively reasonable. Defendant is not entitled, at least at this point, to qualified immunity from Plaintiff's claims alleging violations of freedom of speech and association.[3]

## Municipal Liability

Plaintiff alleges the retaliation against officers associated with CPOA was the result of an unwritten City policy or custom.[4] A municipality is a "person" subject to suit under Section 1983. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). To state a claim for

---

[3] A jury will have to resolve these factual disputes and whether Defendant is entitled to qualified immunity.

[4] Plaintiff seems to refer to the claims against Defendant in her official capacity as his "equal protection claim." As discussed above, Plaintiff has not established a claim under the equal protection clause.

municipal liability Section 1983, a plaintiff must establish three elements: "a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). "The elements of the *Monell* test exist to prevent a collapse of the municipal liability inquiry into a *respondeat superior* analysis. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 415 (1997)). "A municipality may not be subject to liability merely for employing a tortfeasor." *Id.*

*Official Policymaker*

"The first requirement for imposing municipal liability is proof that an official policymaker with actual or constructive knowledge of the constitutional violation acted on behalf of the municipality." *Id.* at 167 (citing *Cox v. City of Dallas, Tex.,* 430 F.3d 734, 748–49 (5th Cir. 2005)). A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Id.* (quoting *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). "[T]he identity of the policymaker is a question of law, not of fact—specifically, a question of state law." *Groden v. City of Dallas, Texas*, 826 F.3d 280, 284 (5th Cir. 2016). "A city's governing body may delegate policymaking authority (1) by express statement or formal action or (2) it may, by its conduct or practice, encourage or acknowledge the agent in a policymaking role." *Zarnow*, 614 F.3d at 167 (quoting *Bennett v. City of Slidell,* 728 F.2d 762, 769 (5th Cir. 1984)).

The Fifth Circuit has found that a city impliedly delegated its policymaking authority to the chief of police where "the chief of police [was] the sole official responsible for internal police policy" and was authorized to speak on the city's behalf through its General Orders. *See also Robinson v. City of Garland, Texas*, No. 3:10-CV-2496-M, 2016 WL 7396048, at *9 (N.D. Tex. Aug. 17, 2016) (holding that a city impliedly delegated its policymaking authority to the chief of

police where the chief's duties included "implementation of Department policy with regard to personnel matters; oversight of suspension and disciplinary actions involving police officers and civilian employees" and the ability to enter general orders and set and modify policies in lieu of the City Council).

In Plaintiff's Original Complaint, he alleges Defendant "was a final policymaker and, therefore, the City officially adopted and promulgated the decision to inflict the . . . adverse employment actions." (Dkt. #1 at p. 5). Plaintiff's Objections and Answers to Defendant's First Set of Interrogatories state that Defendant is the final policymaker for the City because she is the Police Chief and "is the highest level of authority who sets and enforces policies, rules, and orders, and decides and issues discipline." (Dkt. #63, Exhibit 1). In response, Defendant argues that the City Council has retained policymaking authority regarding the "at-will" employment relationship between the City and its employees (Dkt. #55 at p. 25). Defendant states that even if she is considered a final decision-maker, she is not a final policymaker under the City's charter (Dkt. #66 at p. 11); (Dkt. #55 at p. 25). In reply, Plaintiff argues that "since [he] has alleged multiple incidents and not merely a 'single decision,' the arguments concerning final policymaking authority are completely moot" (Dkt. #63 at p. 33).

The City of Corinth Home Rule Charter provides that the City Manager shall "appoint, hire, suspend, and/or remove employees not otherwise provided for in [the] Charter" (Dkt. #55, Exhibit 9 at p. 17). The City Personnel Manual states that the "City Manager or designee will administer and maintain an up to date manual" and that the "City retains the right to revise, cancel, or otherwise change any of the published or unpublished Personnel policies and procedures at its discretion." (Dkt. #55, Exhibit 8 at p. 7). The Acting City Manager here upheld Plaintiff's termination.

However, Defendant had oversight of police officer suspension and disciplinary actions. Defendant authorized the initiation of the internal affairs investigation regarding Plaintiff's alleged violations of Corinth Police Department General Orders, reviewed these internal affairs investigations, and ultimately terminated Plaintiff. Defendant likewise approved General Order number 300 regarding discipline and complaints against police personnel (Dkt. #55, Exhibit 7). Defendant likewise did not introduce evidence that the City Council has ever commented authoritatively on the internal procedures of the police department. *See Zarnow*, 614 F.3d at 167. The City impliedly delegated its policymaking authority to Defendant.

*Official Policy*

Upon finding a policymaker, a court must "consider whether the allegedly unconstitutional action constitutes a "custom or policy" of the municipality." *Id.* at 168. Courts have identified two forms that "official policy" may take. "First, a plaintiff may point to a policy statement formally announced by an official policymaker." *Id*. at 168 (quoting *Webster,* 735 F.2d at 841). In the alternative, the plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Id.* at 169. "A pattern of conduct is necessary only where the municipal actors are *not* policymakers." *Id.* However, "to render a city liable actual or constructive knowledge of a 'custom' must be attributable to the governing body or officials to whom that body has delegated policy-making authority." *Webster v. City of Houston*, 735 F.2d at 841; *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).

Actual knowledge may be shown "by such means as discussions at council meetings or receipt of written information, while constructive knowledge may be attributed to the governing

body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity." *Gehring v. Harris Cty., Texas*, No. CV H-15-0726, 2016 WL 269620, at *5 (S.D. Tex. Jan. 21, 2016).

Plaintiff alleges he was subject to multiple incidents of retaliation, including performance file issues, transfer from school resource officer to night patrol, written reprimand, and termination. Plaintiff introduced evidence that Defendant transferred Foutch from the criminal investigations division to night patrol and that other officers feared joining CPOA would affect their job responsibilities. The Court finds there is an issue of material fact regarding whether there was a persistent widespread policy or custom of retaliating against employees who expressed their right to associate with CPOA. The Court therefore will not address the final element of the *Monell* test, whether there was "a direct causal link between the municipal policy and the constitutional deprivation," at this time. *Piotrowski*, 237 F.3d at 580.

### Texas Labor Code § 101.301 Claim

Defendant argues that she is entitled to dismissal of the Texas Labor Code claim[5] pursuant the Texas Tort Claims Act election of remedies provision, Tex. Civ. Prac. & Rem. Code § 101.106(e) ("Section 101.106(e)"). Section 101.106(e) states that "if a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." *Id.*. Defendant states that because Plaintiff filed Texas Labor Code claims against her in her official and individual capacity, the suit against her in her individual capacity must be dismissed. Defendant argues that the Texas Supreme Court has held that Section 101.106(e) applies to "*all* common law recovery

---

[5] Texas Labor Code Section 101.301 states that "the right of a person to work may not be denied or abridged because of membership or nonmembership in a labor union or other labor organization."

theories alleged against a governmental unit." (Dkt. #55 at p. 26) (citing *Franka v. Velasquez*, 332 S.W. 3d 367, 378-79 (2011)).

However, in *Franka*, the Texas Supreme Court held Section 101.106(e) applies to "all tort theories alleged against a governmental unit." *Franka v. Velasquez*, 332 S.W. 3d at 378 (2011). *See also Mission Consol. Indep. Sch. Dist. v. Garcia,* 253 S.W.3d 653, 659 (Tex. 2008) (stating that "all tort theories of recovery alleged against a governmental unit are presumed to be 'under the [Tort Claims Act].'"). Plaintiff does not bring tort claims against Defendant. Defendant does not point to any case law stating that Texas Labor Code claims are subject to the Texas Tort Claims Act election of remedies provision. Defendant thus does not have a statutory right to dismissal of the Texas Labor Code claim. Further, as stated above, there is a genuine issue of material fact regarding whether Plaintiff's association with CPOA was a motivating factor in his termination. Defendant's motion for summary judgment as to Plaintiff's Texas Labor Code claim is therefore denied.

### Declaratory and Injunctive Relief

Plaintiff also seeks a declaratory judgment stating that Defendant unlawfully deprived Plaintiff of his constitutional rights and an injunction reinstating Plaintiff and preventing Defendant from maintaining unconstitutional polices (Dkt. #1 at pp. 8–9). The Court denies Defendant's motion for summary judgment on these claims at this time.

### CONCLUSION

It is therefore **ORDERED** that Defendant's Motion for Summary Judgment (Dkt. #55) is hereby **GRANTED IN PART** and **DENIED IN PART**. The Court dismisses Plaintiff's equal protection claim and Texas Government Code § 614.021 claim. The remaining claims shall proceed to trial.

**SIGNED this 20th day of June, 2017.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE